**NORFOLK SHIPBUILDING AND DRY-DOCK CORPORATION, Plaintiff,**

v.

**UNITED STATES of America, Defendant.**

**Civ. A. No. 647–69–N.**

United States District Court,
E. D. Virginia,
Norfolk Division.

Jan. 4, 1971.

Christian, Barton, Parker, Epps & Brent by Delman H. Eure, and James Edward Betts, Richmond, Va., for plaintiff.

Lynn W. Ross, Jr., Atty., Tax Division, Dept. of Justice, Washington, D. C., for defendant.

## MEMORANDUM OPINION

KELLAM, District Judge.

Norfolk Shipbuilding and Drydock Corporation (Norfolk Ship) instituted this action on December 19, 1969, pursuant to 28 U.S.C. § 1346(a), for the refund of federal income taxes for 1964 and 1965. The amount claimed is $26,725.68 plus interest and costs. The action challenges determinations by the Commissioner of Internal Revenue that the costs of dredging operations incurred as part of the total cost of pier facilities were not subject to a depreciation deduction and did not qualify for the investment credit under Section 38 of the Internal Revenue Code. Norfolk Ship also attacks the Commissioner's determination that certain interest payments were not deductible because the indebtedness was incurred to permit the plaintiff to continue carrying its tax-exempt securities.

Norfolk Ship contends that the dredging is an integral and necessary part of its pier facilities and, therefore, that the costs of dredging are properly deductible under Section 167; that dredging, as an integral part of a pier facility, comes within the definition of "Section 38 property" and, therefore, qualifies for the investment credit; and that the indebtedness incurred in 1965 was motivated by business considerations unrelated to ownership of the tax-exempt securities and, therefore, that the interest paid on the loans is deductible under Section 163.

Most of the facts have been stipulated, and the legal conclusions are drawn from those facts and the evidence presented at the hearing on September 10, 1970. Norfolk Ship, a Virginia corporation, is now and was during the times involved, engaged in the business of building, converting, and repairing ships. All work is carried on at plaintiff's three locations on the Elizabeth River. Norfolk Ship works on large, ocean-going vessels up to 800 feet in length that require depths up to thirty feet. The largest vessels are brought to the Berkley Plant where Norfolk Ship's main facilities are located. Moored to the piers in the shipyard, these vessels can easily be reached by cranes, utility services, and other equipment required to complete the work. The natural depth of the river at the shipyard is too shallow to accommodate these vessels, and Norfolk Ship must have the river bottom around the piers dredged in order to make the piers accessible to the ships.

In 1963, Norfolk Ship purchased the St. Helena Annex in order to expand the facilities at its Berkley Plant. About half of the property was under water, and improvements included bulkheads, a pier, and dredging adjacent to the pier. The total cost of the St. Helena Annex was $78,119.50, of which $21,779.72 was allocated to the dredging on the basis of an appraisal made in connection with the purchase. Norfolk Ship claimed depreciation deductions on the basis of thirty years of useful life for all the improvements in the St. Helena Annex. The Commissioner disallowed the deduction for that portion of the total cost allocated to the dredging.

Norfolk Ship built Pier 6 at its Berkley Plant in 1964. The entire construction project involved removing an existing bulkhead, excavating the shoreline, dredging a new mooring slip, and installing new bulkheads, in addition to building the new pier. The total cost of Pier 6 was $1,202,263.00, and it was put into service at the end of December, 1964. Norfolk Ship claimed an investment credit for 1964, and depreciation deductions for 1965, based on thirty-five years of useful life. Of the total cost, the Commissioner allocated $135,414.14 to the dredging. The Commissioner allowed the depreciation deductions and investment credit claimed for Pier 6, except for that portion of the total cost allocated to the dredging.

During 1965, Norfolk Ship paid a total of $27,202.00 in interest on several short term notes that totalled $2,000,000.00. Throughout 1965, plaintiff owned various tax-exempt securities which had been purchased over an eight year period ending in 1961. The Commissioner disallowed Norfolk Ship's claim for a deduction under Section 163, determining that the interest expenses were incurred so that plaintiff could continue to carry its tax-exempt securities.

## I

Norfolk Ship contends that the dredging costs for the St. Helena Annex and Pier 6 were incurred as part of the total cost of those facilities, that dredging is a necessary and integral part of the pier facilities, and, therefore, that the costs of dredging are depreciable on the same basis as the costs of the other pier facilities. Here, it should be pointed out that the contract to build Pier 6 specified one price for the entire project, including the dredging. Norfolk Ship contends that the cost breakdown was added only to facilitate understanding of the entire project and establish a basis for progress payments. This contention is not spelled out in the contract, but it can be inferred from the language. Norfolk Ship's contention is also supported by the president of the construction company which built

Pier 6. The contractor testified that the breakdown was to acquaint Norfolk Ship with where the money was being used and that the various items made up "one single contract." The contractor also testified that dredging is "normally [a part of] the cost of a pier unless the pier is located where the water is already deep enough," and that Pier 6 could not have been used for the purposes for which it was designed without the dredging. Regarding the dredging in the St. Helena Annex, it is likewise apparent that the dredging is necessarily linked with the pier and that the price was for the entire "package."

The Commissioner does not contest that dredging is a necessary part of the pier facilities, since the piers would be commercially worthless if the dredging did not provide access from deep water. However, the Commissioner contends that the costs of dredging should constitute an improvement to the land and that dredging is an intangible asset without a reasonably ascertainable useful life and is not subject to exhaustion or obsolescence.

Section 167(a) of the Internal Revenue Code applies to deductions for depreciation and provides:

> *General rule.*—There shall be allowed as a depreciation deduction a reasonable allowance for the exhaustion, wear and tear (including a reasonable allowance for obsolescence)—
>
> (1) of property used in the trade or business, or
>
> (2) of property held for the production of income.

While there is no direct authority on this precise issue, a similar factual situation was the subject of Commonwealth Natural Gas Corp. v. United States, 395 F.2d 493 (4th Cir. 1968), where the Court of Appeals affirmed a District Court determination that costs of clearing and grading were attributable to the costs of constructing a pipeline and depreciable with the pipeline. *Commonwealth Natural Gas* is not the only case to hold that clearing and grad-

ing costs are deductible under Section 167. In Portland General Electric Co. v. United States, 189 F.Supp. 290 (D.Or. 1960), aff'd per curiam, 310 F.2d 877 (9th Cir. 1963), the Court held that costs of clearing easements for electric power lines in order to erect the poles were attributable to the cost of the entire operation and, therefore, were depreciable. And in Algernon Blair, Inc., 29 T.C. 1205 (1958), the Tax Court determined that the costs of clearing, grading, and landscaping in a housing development were directly related to the construction of depreciable assets and were depreciable. The Commissioner acquiesced in *Algernon Blair*. 1958–2 Cum. Bull. 4. Recently, in Southern Natural Gas Co. v. United States, 412 F.2d 1222, 1230, 188 Ct.Cl. 302 (1969), the Court of Claims stated: "It has long been recognized that expenditures so intimately related to, and connected with, the acquisition of a capital asset are to be treated as part of the cost of or investment in the asset." It seems fair to conclude, then, that costs (dredging) incurred in the acquisition (St. Helena Annex) or construction (Pier 6) of a capital asset which are directly related to the acquisition or construction and constitute or involve an integral part of the asset are includible in the cost basis of the asset for purposes of depreciation.

Indirectly, this conclusion is recognized by the Commissioner in this case, because that part of the total cost of Pier 6, for which a depreciation deduction was allowed, included excavating the shoreline. *See also* Rev.Rul. 65–265, 1965–2 Cum.Bull. 52; Rev.Rul. 65–264, 1965–2 Cum.Bull. 53. Certainly there is a distinction between clearing and grading land or excavating a shoreline and dredging a river bottom in connection with pier construction; however, it is equally certain that grading, excavating, and dredging are each essential to and a necessary part of the entire operation. It is difficult to understand why a deduction should be allowed for grading and excavating but disallowed for dredging. Yet the Commissioner contends that dredging should be treated differently from grading, clearing, and excavating because dredging is an intangible asset. Realistically, dredging is no more intangible than grading or excavating. The Commissioner bases his distinction on the facts of *Commonwealth Natural Gas, supra,* stating that the trial court "relied heavily on the fact that the clearing and grading would not be of significant benefit to any subsequent construction." Here, the Commissioner argues that the dredging would be "of significant benefit to any subsequent construction." The evidence simply does not support this argument. One of Norfolk Ship's directors stated on cross-examination that if Pier 6 were demolished, some of the dredging might be reusable depending on the size, design, and location of the new pier. The same witness also testified that it was unlikely that usable dredging would remain after the demolition of Pier 6 and that if Pier 6 were demolished, Norfolk Ship would not maintain the dredging. Other testimony, also unrefuted by the Commissioner, indicated that in the past when Norfolk Ship abandoned or demolished a pier, the dredging could not be and was not used in connection with subsequent pier construction. The reason is obvious. The trend in the shipping industry is toward construction of larger vessels. To accommodate these vessels, new piers must necessarily be of larger and different dimensions. The evidence clearly demonstrates that developments in the shipping industry will probably render the dredging unusable in subsequent pier construction.

The Commissioner cites Rev.Rul. 68–483, 1968–2 Cum.Bull. 91 as support for holding that the costs of dredging are not depreciable. The Ruling, however, is merely the Commissioner's own assessment of Norfolk Ship's position. Rev. Rul. 68–483 does not reflect the reasoning of *Commonwealth Natural Gas* or other cases dealing with Section 167 of the Internal Revenue Code, and it should not be construed as the correct application of the law.

The Commissioner also argues that because Norfolk Ship periodically redredges the mooring slips to maintain them at a usable depth, the dredging never wastes away or becomes exhausted and, therefore, is not depreciable. Of course, this reasoning ignores the obvious fact that the dredging is useful only as long as it serves a pier or other docking facility. When the pier becomes obsolete, the dredging, which is an integral part of the entire facility, also becomes obsolete. The pier has a definite useful life. Nor does the fact that Norfolk Ship claims business expense deductions for its maintenance of the dredging have any bearing on its right to a deduction for depreciation. The fact that an asset is maintained in normal operating condition does not preclude a depreciation deduction under Section 167. San Francisco & P. S. S. Co. v. Scott, 253 F. 854 (D.Cal.1918). Furthermore, the Federal Tax Regulations recognize that maintenance of an asset is required. Section 1.167(a)–1(b) states that a taxpayer's policy as to maintenance and repairs is taken into account in determining the useful life of property for depreciation purposes.

Again, it is obvious that the dredging at the St. Helena Annex and Pier 6 is directly related to the use of the piers, and together the components constitute an integrated docking facility. The pier is worthless without the dredging which provides access from deep water. The dredging alone, without the pier, is equally worthless; there is little point in bringing a vessel into the mooring slip if it is not accessible from the shore. Since the dredging is properly an integral part of the pier facility, the useful life of the dredging is inseparably linked with that of the pier. The useful life of the dredging will diminish and end with that of the pier. Regardless of the wasting and exhaustion provisions of Section 167, the entire pier facility is subject to obsolescence. Accordingly, the useful life of the dredging is subject to obsolescence within the meaning of Section 167. The costs allocated to the dredging at the St. Helena Annex and Pier 6 are depreciable, and the deductions should have been allowed.

## II

The second question, whether that portion of the cost of Pier 6 allocated to the dredging qualifies for the investment credit under Section 38 of the Code, involves many of the same questions discussed in the depreciation issue. To qualify for the investment credit, Norfolk Ship's dredging must come within the definition of "Section 38 property" as set out in Section 48. Section 38 provides that taxpayers are entitled to a credit against their federal income tax for certain qualified investments in property. Section 48 defines the types of property which qualify for the investment credit and, in pertinent part, provides:

(a) Section 38 property.—

(1) *In general.*—Except as provided in this subsection, the term 'section 38 property' means—

(A) tangible personal property, or

(B) other tangible property (not including a building and its structural components) but only if such property—

(i) is used as an integral part of manufacturing, production, or extraction, or of furnishing transportation, communications, electrical energy, gas, water, or sewage disposal services.

The Federal Tax Regulations give a more detailed explanation, and Section 1.48–1(a) provides that Section 38 property means:

property (1) with respect to which depreciation (or amortization in lieu of depreciation) is allowable to the taxpayer, (2) which has an estimated useful life of four years or more (determined as of the time the property is placed in service), and (3) which is either (i) tangible personal property, (ii) other tangible property (not including a building or its structural

components) but only if such other property is used as an integral part of manufacturing [or] production,

\* \* \*

■ The Commissioner allowed the investment credit for all the costs of Pier 6 except that portion allocated to the dredging. His reasons for disallowing the investment credit are basically the same as the reasons for disallowing the depreciation deduction. However, for the same reasons that the dredging costs are depreciable, those costs should be subject to the investment credit. Dredging is an integral part of the entire pier facility, and neither the pier nor the dredging is commercially usable without the other. There is no valid reason why the investment credit should not be allowed for the costs of the dredging.

■ The Commissioner contends that the dredging must satisfy three requirements before it qualifies for the investment credit: first, the property must be personal rather than real property; second, the property must be subject to a depreciation deduction; and third, the property must be depreciable as tangible rather than as intangible property. The Commissioner's position is that the dredging fails to meet any of these requirements. The argument would certainly be valid if the dredging had some commercial value independent of the pier and were not an integral part of the entire pier facility. The dredging would not exist but for use with Pier 6. Since the dredging is an integral part of the Pier 6 facility, as Norfolk Ship contends, and has no independent value, which the Commissioner argues it has, the fact that the dredging may not satisfy the Commissioner's tests is immaterial. When an expenditure relates to an improvement or physical development added to the land, or in this case the river bottom, it may qualify for the investment credit if the property meets all the requirements necessary for the investment credit and if the improvement is not inextricably associated with the real property. Dredging costs are directly associated with the construction of the pier and are not inextricably associated with the land. Since the dredging costs have a direct association with the construction, they are part of the costs of construction of the pier.

■ Reference to the legislative history of the investment credit provisions also indicates that these statutes should not be construed to deny the credit as the Commissioner contends. Generally, the purpose was to stimulate economic growth by permitting a reduction in the cost of acquiring new equipment. *See* F. P. Wood & Son of Elizabeth City, Inc. v. United States, 314 F.Supp. 1205 (E.D.N.C.1970). The history also indicates that intangible property, for which the investment credit is not available means assets such as patents and copyrights. H.R. 1447, 87th Cong.2d Sess. (1962-3 Cum.Bull. 516). This definition is repeated in the Federal Tax Regulations, Section 1.48-1(f), which goes into considerable detail in defining the costs of intangible assets. Clearly, the dredging connected with Pier 6 is not within the definition of intangible property as contemplated by Section 1.48-1 (f) as the Commissioner argues. Rather the dredging, as an integral part of the Pier 6 facility appears to come within the definition of tangible property set forth in Section 1.48-1(d) (1, 2, 4), to which the investment credit applies. Irrespective of whether the dredging is tangible or intangible, the entire pier facility, including the dredging, is a single asset. The investment credit should have been allowed for that portion of the total cost of Pier 6 allocated to the dredging just as the credit was allowed for all the other costs of the pier.

### III

■ The final question is whether Norfolk Ship is entitled to a deduction for interest paid in 1965, if it held tax-exempt securities while the indebtedness was outstanding. Section 163 of the Internal Revenue Code provides that "[t]here shall be allowed as a deduction all interest paid or accrued within the taxable year on indebtedness." Section

265 makes the following exception to this general rule:

No deduction shall be allowed for—

\* \* \* \* \* \*

(2) *Interest.*—Interest on indebtedness incurred or continued to purchase or carry obligations \* \* \* the interest on which is wholly exempt from the taxes imposed by this subtitle \* \* \*.

Obviously the purpose of this section is to prevent a taxpayer from obtaining a double tax benefit by deducting interest on borrowed funds which enable the taxpayer to purchase or carry securities bearing tax-exempt interest.

 The Commissioner contends that the tax-exempt securities Norfolk Ship held when it borrowed the $2,000,000 in 1965, brings the interest within the exclusion of Section 265(2). However, as Norfolk Ship points out, Section 265(2) does not necessarily and automatically disallow an interest deduction merely because the taxpayer owned tax-exempt securities while the indebtedness was outstanding. Wisconsin Cheeseman, Inc. v. United States, 388 F.2d 420 (7th Cir. 1967); *See also* Edmund F. Ball, 54 T.C. No. 114 (1970). Before the interest deduction is disallowed, there must be a direct relationship between the indebtedness and the tax-exempt securities. Leslie v. Commissioner of Internal Revenue, 413 F.2d 636 (2d Cir. 1969); Illinois Terminal R. R. v. United States, 375 F.2d 1016, 179 Ct.Cl. 674 (1967).

 The legislative history of Section 265(2) likewise indicates that interest deductions should not be disallowed unless there is a purpose to obtain a double tax benefit. The "purpose" requirement has been a part of the statute since 1917. In its original form the statute allowed the taxpayer a deduction for

[a]ll interest paid within the year on his indebtedness except on indebtedness incurred for the purchase of obligations or securities the interest upon which is exempt from taxation as income under this Title. Seidman,

Legislative History of Federal Income Tax Laws. (1938–1961), p. 942.

In the Revenue Act of 1918, the applicability of the section was broadened to substantially its present scope so as to deny the deduction for interest expense on indebtedness

\* \* \* incurred or continued to purchase or carry obligations or securities \* \* \* the interest upon which is wholly exempt from taxation under this title as income to the taxpayer \* \* \* *Ibid.,* p. 910.

A broader statute had been proposed and passed by the House of Representatives. This version eliminated any requirement of "purpose" or "direct relationship" and automatically offset tax-exempt income against deductible interest expenses without regard for any relationship between the two items. The House version allowed deductions only for

\* \* \* interest paid or accrued within the taxable year on indebtedness \* \* \* in excess of interest received free from taxation under this title \* \* \* *Ibid.,* p. 910.

The Report of the House Committee stated that the 1917 statute was "difficult of administration, for in many cases it is impossible to tell for what purpose indebtedness is incurred." *Ibid.,* p. 911. The Senate disagreed with this reasoning, so the statute was not amended. A similar effort to amend was rejected in 1924, after an effort to limit deductible interest to that incurred in excess of "the amount of interest on obligations and securities the interest upon which is wholly exempt from taxation under this title." One of the objections to the proposed revision was raised by Senator Simmons who stated:

I might happen to have some tax-exempt securities and there may be reasons why I do not want to dispose of them; I desire to keep them; I want to buy a home, and I have not the money, so I borrow the money to buy a home. Why should I be denied my legitimate lawful deduction of that

interest on account of the fact that I happen to have a few government securities in my possession? There is no reason assigned by any advocate of this bill why an honest loan of that sort should be subject to the provisions of this section. *Ibid.*, pp. 729–30

In 1926, there was another unsuccessful effort to substitute the language of the original statute, as amended in 1918, with substantially the same language as that attempted in 1918 and 1924. Thus Congress elected to retain the statute in substantially its original form. Courts have also recognized the Congressional purpose inherent in the legislative history. The Board of Tax Appeals, in R. B. George Machinery Co. v. Commissioner, 26 BTA 594 (1932), stated:

> We think the exception [provided for by the then equivalent of Section 265(2)] should not be construed more broadly than to effect its obvious purpose. It was not intended to penalize legitimate business or to deny to it the right to deduct interest paid for borrowed money, which money was used for the purpose of carrying on its regular functions.

The Congressional purpose behind Section 265(2) is further supported by Revenue Procedure 70–20, 1970–33 I.R.B. 26, issued on August 17, 1970. Revenue Procedure 70–20 deals primarily with the applicability of Section 265(2) to banks but makes the following general statement with respect to its application:

Sec. 2 BACKGROUND.

.01 Section 265(2) is derived from section 1201(1) of the Revenue Act of 1917 and section 234(a) (2) of the Revenue Act of 1918. It is clear from the legislative history of those sections and of subsequent unsuccessful efforts to amend such sections (or their successors) that Congress intended to disallow interest under such section only upon a showing of a purpose by the taxpayer to use borrowed funds to purchase or carry tax-exempt securities. See, *e. g.*, H.Rept. 767, 65th Cong., 10; S.Rept. 617, 65th Cong. 6,

7 (1918); 65 Cong.Rec. 7541–7542 (1924); and 67 Cong.Rec. 2964 (1925).

Surely, this Court should not now undertake to do by interpretation and construction what Congress refused to do by legislation. The applicability of Section 265(2) requires a specific factual inquiry in each case. The question here is whether Norfolk Ship's indebtedness was "incurred or continued to purchase or carry [tax-exempt] obligations." If there was such a purpose or relationship, the deduction was properly disallowed. If there was no such relationship, Norfolk Ship is entitled to the deduction.

The "direct relationship" rule was stated in *Illinois Terminal, supra,* as follows:

> It is necessary to establish a sufficiently direct relationship of the continuance of the debt for the purpose of carrying the tax-exempt bonds.

> If the loan was needed to sustain plaintiff's business operation rather than its ownership of tax-exempt securities, the prohibitory features of section 265(2) will not apply. R. B. George Machinery Co., 26 B.T.A. 594 (1932); Sioux Falls Metal Culvert Co., 26 B.T.A. 1324 (1932).

It is apparent, then, that Section 265 (2) applies where the proceeds of a loan are used to purchase tax-exempt securities, where the securities are held for use as collateral for loans, or where the taxpayer purposefully holds the securities and incurs or continues indebtedness to meet other needs that could have been satisfied by proceeds from the sale of the securities. However, as *Illinois Terminal* suggests, Section 265(2) does not apply if there is no connection between the indebtedness and the securities. In Leslie v. Commissioner, *supra*, the Court of Appeals stated that an "appropriate interpretation of Section 265(2) is whether or not there is a business 'purpose' to purchase or carry obligations the interest on which is exempt, and to incur indebtedness therefor." 413 F.2d at 640. The Court of Appeals determined that

there was a direct relationship between the continuance of a debt and the carrying of tax-exempt securities by a stock broker and that the "purpose" requirement was satisfied. The *Leslie* test, that there be a purpose to obtain a double tax benefit, is also inherent in *Illinois Terminal,* where the Court weighed the business reasons for carrying the tax-exempt securities and concluded that favorable tax aspects dominated the decision not to sell the securities. *See also* Kirchner, Moore & Co., 54 T.C. No. 91 (1970).

The courts have found on numerous occasions that valid business reasons have been the sole motivation for incurring indebtedness and that the loans had no direct relationship to the tax-exempt securities. In *Wisconsin Cheeseman, supra* and *Edmund F. Ball, supra,* the courts determined that Section 265(2) did not apply and that interest was deductible even though the indebtedness was incurred while the taxpayer continued to carry tax-exempt securities.

Here, the Commissioner recognizes the propriety of the "direct relationship" or "purpose" test but merely argues that because the tax-exempt securities could have been sold, the "total impression" of the case is that Section 265(2) should apply to disallow the deduction. Applying the facts of this case to the "direct relationship" or "purpose" test, it is obvious that the indebtedness incurred by Norfolk Ship in 1965 had a valid business purpose and was not incurred to create a tax-exempt income or obtain a double tax benefit.

Norfolk Ship owned various tax-exempt securities which had been purchased between 1953 and 1961, and which were held throughout 1965. These securities, which made up about 29% of Norfolk Ship's investment portfolio, were acquired as investments at a total cost of slightly over $400,000. Approximately half of these securities were pledged with the Federal Reserve Bank in connection with Norfolk Ship's self-insurance program under the Longshoremen's and Harbor Workers' Compensation Act.

During 1965, Norfolk Ship borrowed $2,000,000.00 to meet immediate and unanticipated cash requirements. At the time, Norfolk Ship was involved in a substantial contract with the Navy, and the periodic payments provided for in the contract were frequently delayed by disputes over work completion. The delays caused substantial shortages in Norfolk Ship's current operating capital so that Norfolk Ship was unable to meet its routine expenses such as the weekly payroll. From March 11 to August 25, 1965, Norfolk Ship had to borrow $1,000,000.00. The total debt was repaid on September 3, 1965, the day Norfolk Ship received a provisional payment under the Navy contract. Plaintiff borrowed an additional $1,000,000.00 between November 16 and December 31, 1965, and these loans were repaid on January 25, 1966, when Norfolk Ship received another provisional payment from the Navy. The money was borrowed on several short term notes at the prime interest rate. The unrefuted testimony was that Norfolk Ship does not normally incur indebtedness of this type and that the cash shortages could not be foreseen at the time the Navy contract was negotiated or when the tax-exempt securities were purchased. The treasurer of Norfolk Ship testified that the money was borrowed only to meet the immediate need for cash that was created by the delayed payments.

None of Norfolk Ship's tax-exempt securities were used as collateral for the loans, and no securities were purchased while the loans were outstanding. The Commissioner does not contest that the need for cash was immediate or that the loans were necessary to sustain Norfolk Ship's normal business operations; the Commissioner merely argues that Norfolk Ship could and should have sold its securities to help meet these needs. However, the value of the securities was only $405,426.75, and a period of about thirty days would have been required to get the securities out

of the pledged account. Withdrawing the securities pledged with the Federal Reserve Bank would have required approval by the Department of Labor. The evidence is that Norfolk Ship never considered selling its tax-exempt securities; any sale would have required an investigation of market conditions and considerable advance planning. Norfolk Ship's need for cash was so immediate that the securities could not have been sold in time to sustain normal business operations. It is clear that the interest Norfolk Ship paid on its indebtedness in 1965 is not within the scope of Section 265(2) as interpreted by *Leslie* and *Illinois Terminal*. Since there was no relationship between the indebtedness and the tax-exempt securities held throughout 1965, Section 265(2) does not apply, and the entire interest Norfolk Ship paid in 1965 should have been allowed as a deduction under Section 163 of the Code.

Norfolk Shipbuilding and Drydock Corporation is entitled to recover on each claim involved in this action for a total amount of $26,725.68 plus statutory interest and costs. If counsel cannot agree on the exact sum, each should, within twenty days, submit his contention to this Court for determination. Also within twenty days, counsel will present an appropriate order on judgment in this cause.