Robert W. TUNNELL and Eolyne K. Tunnell, Plaintiffs,

v.

UNITED STATES of America, Defendant.

James M. TUNNELL, Jr. and Mildred S. Tunnell, Plaintiffs,

v.

UNITED STATES of America, Defendant.

Civ. A. Nos. 4287, 4302.

United States District Court, D. Delaware,

Nov. 28, 1973.

James M. Tunnell, Jr., Wilmington, Del., and Robert W. Tunnell, Georgetown, Del., pro se and as attorneys for the other plaintiffs.

Ralph F. Keil, U. S. Atty., Alan S. Yoffie, Asst. U. S. Atty., Wilmington, Del., and Michael von Mandel, Trial Atty., Tax Div., U. S. Dept. of Justice, Washington, D. C., of counsel, for defendant.

## OPINION

LATCHUM, Chief Judge.

This consolidated action arises out of a dispute between the plaintiffs [1] and the Internal Revenue Service ("IRS") over the depreciability of certain expenditures which the plaintiffs capitalized in the development of two mobile home park ventures owned and operated by them as partners in Sussex County, Delaware.

As a result of an IRS audit, the plaintiffs were notified in 1969 by the IRS that adjustments were being made to the plaintiffs' partnership returns for 1966, 1967 and 1968 by disallowing certain deductions for depreciation and a deduction for an operating expense.[2] The adjustments so made in the partnership returns resulted in alleged invididual income tax deficiencies to the plaintiffs, Robert and Eolyne Tunnell in C.A.No. 4287, for which they received a Statutory Notice Statement of additional income taxes due of $5,686.35 for 1966, $5,093.32 for 1967 and $6,864.25 for 1968.[3] The IRS adjustment in the partnership returns also resulted in alleged individual income tax deficiencies to the plaintiffs, James M. Tunnell, Jr. and Mildred S. Tunnell, for which they received a Statutory Notice Statement of additional income taxes due of $6,076.65 for 1966, $4,448.77 for 1967 and $9,209.-65 for 1968.[4] In both cases the plaintiffs under protest paid the taxes allegedly due plus interest within the time required by law and then instituted these actions for a refund of the additional amounts so paid.[5] Jurisdiction exists by virtue of 28 U.S.C. § 1346(a)(1).

Before reaching the merits of this litigation a brief review of the facts giving rise to the dispute is in order. The plaintiffs in these refund suits formed partnerships to develop and operate two mobile home parks in Sussex County, Delaware known as "Pot-Nets" and "Indian Landing." Each plaintiff owns 25 per cent of the Pot-Nets partnership. With respect to Indian Landing each plaintiff in C.A. 4302 owns 25 per cent of the partnership, while plaintiff Robert Tunnell in C.A. 4287 owns the remaining 50 per cent.

Lots in both parks are leased to third parties on long term leases [6] for the purpose of allowing these third parties to

1. The plaintiffs in each Civil Action are husband and wife who filed joint income tax returns for the years in dispute.

2. Docket Item 1, Ex. A1 & A2 (C.A. 4287).

3. Docket Item 1, Ex. A4 (C.A. 4287); Pretrial Order par. (a).

4. Docket Item 1, Ex. 4 (C.A. 4302); Pretrial Order par. (a).

5. Docket Item 1, pars. 10–15 in (C.A. 4302 & C.A. 4287).

6. The original leases at Pot-Nets were permanent leases but for the past four years are 20 year leases, while the leases at Indian Landing are for 10 years. These leases may be broken by the tenant without cause but can be cancelled by the owners only with cause. (Trial Record—"Tr." 12, 87, 105).

place mobile homes thereon which are used as weekend and vacation homes by the tenants.[7]

Both mobile home parks are situated on land which in its original state was part forested, in part cultivated fields and in part marshland.[8] The wooded and cultivated areas of the high land were separated from the open waters of Indian River Bay by low-lying marshes.[9] Because the marshland was soft and tended to be wet, it was totally unsuited for either building or travel. Hence the taxpayers caused to be designed and excavated certain waterways, called lagoons, which are simply canals.[10]

The lagoons or canals were erected for several purposes. They provide a safe harbor for recreational boats and make a ready and convenient place ashore for those who reside in the projects and want their boats close to their homes. The lagoons when bulkheaded, are more appealing esthetically than the marshes they replaced. The material dredged from the lagoons was also used as fill behind the bulkheads on the remaining low lands upon which roads, recreational, playground and, in some instances, living areas could be placed. The lagoons or canals also serve to provide surface water drainage for the necessarily flat and low terrain on which the projects were located.[11]

In order to make the wooded areas suitable for use, portions of it were thinned while the remainder was completely cleared.[12] Thereafter all of the solid land areas were graded, shaped and landscaped to be used as mobile home lot sites and recreational areas.[13]

When completed, the parks featured mobile home sites, private roads, street lights, water and electricity lines, shrubbery and landscaping, playground areas for children, shuffleboard courts, miniature golf courses and other recreational facilities.[14] The plaintiffs also provided a central TV tower for the tenants at Indian Landing, and a swimming pool for the tenants at Pot-Nets.[15]

On the partnership tax returns for Pot-Nets in the years in dispute 1966 through 1968,[16] the plaintiffs attempted to capitalize all their expenditures and to claim a depreciation allowance. The IRS allowed depreciation on all expenditures except those labeled "lagoons" and those labeled "land improvements." "Lagoon" expenditures consisted of the initial dredging expenses while "land improvements" consisted of the expenses of surveying, clearing or thinning wooded areas, bulldozing and grading solid land areas, and shrubbery and landscaping. The plaintiffs had claimed a ten year useful life for the "lagoons" and a twenty year useful life for "land improvements." Another item disallowed by the IRS from the 1966 Pot-Nets return was an expenditure of $6,819.23 for bulldozing, land clearing and hauling claimed by the plaintiffs to be an operating expense.[17]

Similarly, with respect to the Indian Landing partnership tax returns, the IRS refused to allow depreciation on the same type of expenditures.

As previously noted the net effect of the above disallowances was to decrease the amount of partnership loss for each plaintiff and in turn increase each individual's taxable income.

Trial in the instant cases was held on June 6 and 7, 1973. Since post-trial briefing has been completed the matter is now ripe for decision.

26 U.S.C. § 167 provides:

"(a) General rule.—There shall be allowed as a depreciation deduction a

7. Tr. 261.

8. Px. 1, Px. 12, Tr. 8, 110.

9. Id.

10. Tr. 25–27, 30, 64, 112, 185.

11. Tr. 15–17, 26.

12. Tr. 73–74, 107.

13. Tr. 18, 135, 137.

14. Tr. 105–106.

15. Tr. 12–13; 106.

16. Dx. 1.

17. The plaintiffs now seek to have this item treated as a depreciable capital expenditure.

reasonable allowance for the exhaustion, wear and tear (including a reasonable allowance for obsolescence)—

(1) of property used in the trade or business, or

(2) of property held for the production of income."

Differing interpretations of this deceptively simple provision of the Internal Revenue Code are the basis of the controversy presently before the Court. The Government contends that the lagoons and land improvements are an integral part of the land on which the mobile home parks are situated, and therefore the expenditures thereon are not depreciable because land is incapable of wearing out, becoming obsolete, or reverting to marshland. The Government also contends that even if the lagoons are capable of wearing out, their limited lives are indeterminate so that no depreciation is allowable.

The plaintiffs contend first that the lagoons and land improvements are features of a total complex which itself has a limited life, so that these components of the whole derive their expectancy of a useful business life from the limited life of the whole. The plaintiffs contend second that the Government is estopped from asserting the non-depreciability of the expenditures because certain Guidelines for Depreciation (Revenue Ruling 62–21) [18] published by the IRS led them to believe prior to undertaking the projects that all the expenditures in dispute were depreciable. That plaintiffs also contend with respect to the lagoons that they are physically wearing out over a reasonably predictable period, and therefore should be depreciable over that period.

■ The Court will first deal with the lagoons expenditures. This Court holds that the lagoons are assets susceptible to depreciation. The value of the lagoons is in large part related to their role as an attractive feature of a waterfront mobile home park. As discussed above, the lagoons were designed to provide a safe haven for the boats of tenants, to provide a waterway for ingress and egress to Indian River Bay for boat owning tenants, and to provide surface water drainage for the parks. It goes without saying that the lagoons will be useful for those purposes only as long as the projects exist. When the mobile home projects become obsolete, the lagoons, which are an integral part of the projects, also become obsolete. Norfolk Shipbuilding & Drydock Corp. v. United States, 321 F.Supp. 222, 227 (E.D.Va. 1971). Therefore the useful lives of the lagoons do not exceed the useful lives of the projects so that the initial costs of dredging the lagoons may be depreciated over the useful lives of the projects.

The Government argues that the useful lives of the lagoons will continue indefinitely since they could serve other uses after the projects become obsolete, and since the useful lives of the lagoons are indeterminate, no depreciation on them may be allowed. This position is inconsistent with the IRS' own regulations however. 26 CFR § 1.167(a)–1(b) provides:

"For the purpose of section 167 the estimated useful life of an asset is not necessarily the useful life inherent in the asset but is the period over which the asset may reasonably be expected to be useful to the taxpayer in *his* trade or business or in the production of *his* income." (Emphasis added).

While conceivably the lagoons could serve some other use after the mobile home parks become obsolete, this possible use is irrelevant to a determination of their useful lives for purposes of depreciation allowance. See Southern Natural Gas Company v. United States, 412 F.2d 1222, 1233, 188 Ct.Cl. 302 (1969). The plaintiffs are not in another business, they are in the business of owning and operating a mobile home park and when the useful lives of the projects terminate after twenty years (a period allowed by the IRS),[19] the useful lives of

18. Px. 21.

19. Docket Item 19, pars. 7 and 12; Tr. 155–157.

the lagoons will also be deemed to have ended for tax purposes.

Moreover private roads have been treated as tangible additions distinct from the underlying land which are depreciable over their useful lives. Rev. Rul. 65–265; Aurora Village Shopping Center, Inc., 29 TCM 126 (1970); D. Loveman & Sons Export Corp., 34 T.C. 776 (1960), aff'd per curiam, 296 F.2d 732 (C.A. 6, 1961), cert. den., 369 U.S. 860, 82 S.Ct. 950, 8 L.Ed.2d 18 (1962); Clinton Cotton Mills v. Commissioner, 78 F.2d 292 (C.A. 4, 1935). The Court can perceive no sound basis in logic for treating the lagoons differently with respect to depreciability. They appear similar in the following respects: Both roads and lagoons serve a useful purpose in providing ingress and egress to a given project. In both instances their useful lives are peculiarly tied to the useful lives of the entire project to which they provide access since without the existence of the project, there would be little reason to use the access facilities. Thus roads and lagoons would both be virtually worthless without the existence of the project. *Norfolk Shipbuilding & Drydock*, supra, 321 F.Supp. at 227. Just as the costs of building a road for land traffic include the expenses of clearing and grading the underlying land, so also the costs of creating a lagoon to facilitate marine traffic include the expenses of dredging to a sufficient depth. Also just as the physical life of a road may be increased by covering its surface with a more permanent material such as cement or blacktop, similarly the physical life of a lagoon may be increased by bulkheading its sides. Since the uses and expenses of the waterways and roads appear closely analogous, the Court holds that as to depreciability they should be treated similarly.

With respect to the lagoons at Pot-Nets, the plaintiffs estimated on their tax returns their useful lives at ten years, while the bulkheads, boat slips, docks and moorings were estimated to have a useful life of twenty years.[20] While the Court previously observed that the useful life of the lagoons would not be longer than the useful life of the entire Pot-Nets project, it conceivably could be shorter in the event that the lagoons physically wear out in a shorter period of time than the other components of the project.

Toward that end, the plaintiffs have introduced evidence of surveys done by themselves to determine the rate at which the lagoons are filling up by erosion and silting.[21] Calculations based on the survey data estimate the useful life of the lagoons at Pot-Nets as 13.22 years,[22] after which time larger pleasure craft will no longer be able to use them.[23] However, the plaintiffs did admit that their measurements were not made with scientific precision[24] and they admitted that the filling-in may not continue at its past rate.[25] In order to claim a swifter depreciation rate the plaintiffs have the burden of proving that the lagoons will physically wear out before the remainder of the project is obsolete. Cf. Psaty v. United States, 442 F.2d 1154 (C.A. 3, 1971). The plaintiffs have not met their burden of proving that the useful life of the Pot-Nets lagoons is shorter than twenty years useful life assigned to the majority of the components of the project, and depreciation should be allowed on the basis of a twenty year useful life. Since the lagoons at Indian Landing were assigned a useful life of twenty years, the useful life assigned to the entire project, no adjustment need be made.

20. Tr. 155.

21. Tr. 38–41; 82.

22. Tr. 42.

23. Since the banks of the lagoons in many instances are leased to and occupied by tenants who installed mobile homes and made other improvements to their lots, the plaintiffs lack access to the banks and cannot conduct operations to reverse the filling-in effect either by dredge or by dragline. Tr. 52, 113, 126, 256.

24. Tr. 244.

25. Id.

Turning now to the land improvement costs, the plaintiffs argue that all these expenditures in dispute, primarily clearing, grading and landscaping costs, should be considered to be part of the cost of creating waterfront mobile home park projects and therefore depreciable over the useful lives of the projects. The Government argues that all the expenditures in dispute resulted in improvements to the underlying land, and since the improved land is incapable of physically wearing out or becoming obsolete, the costs of improving the land are not depreciable.

▉ The Court is unable to agree with either position. Land improvement expenditures which increase the value of the land without regard to the particular use made of the land must be regarded as a cost of improving the land and not a cost of the project as the plaintiffs contend. As the Government asserts, since the improved land will not physically wear out[26] or become obsolete, the costs of improving the land itself are not depreciable. However, contrary to the Government's assertion, not all of the expenditures in dispute increased the value of the land *per se*. Some of the expenditures in dispute are attributable to components of the projects which will become worthless when the projects cease to exist. These latter expenditures will be considered part of the costs of creating waterfront mobile home park projects rather than expenditures related to improving the land itself and are depreciable over the useful lives of the projects.

The plaintiffs, in support of their position that all the disputed expenses are depreciable, rely on Trailmont Park, Inc., 30 TCM 871 (1971), a memorandum Tax Court opinion which permitted depreciation of all the costs of clearing, grading, terracing and landscaping land in creating a mobile home park. However, there none of the expenditures improved the land generally by inherently increasing its value, but only facilitated the construction of the park. The underlying land involved there was a mountainside upon which several levels of terraces were landscaped to hold trailer pads. The resultant land configuration was useable only to support a mobile home park. The Tax Court observed that any other use of the land would require complete reshaping of it, 30 TCM at 873, and therefore all of the clearing, grading, terracing and landscaping expenditures would lose their value upon cessation of the mobile home park. Thus, the expenditures were inextricably associated with the mobile home park and not with the underlying land. In contrast in the instant situation, some of the expenditures resulted in an increase in the value of the land *per se*.

▉ The Court will now apply this general rule to the types of expenditures in dispute. One of the major expenditures was for clearing or thinning wooded areas. The Court holds that these expenditures did not increase the value of the land *per se*. The clearing had to be done in a pattern peculiar to the creation of a mobile home park. The plot plans[27] and photographs[28] show a veritable honeycomb of small, tree-shaded lots and roads. Apparently, on each lot some trees were left standing, but a swath was cut through them wide enough to permit a trailer to be placed on the land. Because of the present use of the land, the configuration of trees and cleared area is in a unique pattern, and were the land to be put to any other use, most of the trees now left standing might have to be felled, so that what was originally a wooded area would become essentially treeless. The Court takes judicial notice that in today's market cleared land often has a lower value for residential purposes than it would

26. Although the plaintiffs asserted that the land would ultimately return to its former state, no evidence was introduced estimating the duration of the land in its present improved state.

27. Px. 3, Px. 14.

28. Px. 15–I; Px. 9–A; Px. 7–6.

have if it were still wooded, and it cannot be said that the clearing of wooded areas that was accomplished in the instant case to prepare the land for use as a mobile home park increased the value of the land *per se*. Thus the clearing and thinning expenditures may be regarded as costs of creating the projects and may be depreciated over the useful lives of the projects.

An even stronger case is presented for the costs of landscaping. Were the land put to any other use, existing lots and streets would have to be obliterated and all landscaping would need to be redone. Thus, landscaping expenditures may be considered a cost of creating the projects and may be depreciated over the useful lives of the projects.

However, as for grading expenses, it would appear that most of the grading expenses increased the value of the land *per se*. It is fair to say that for most purposes, graded dry land would have a greater value than marshland. Thus, the expenditures for grading the land will be considered a non-depreciable expenditure of improving the land itself, except for that portion of the grading expenditures which are attributable to the creation of some feature which is depreciable over the useful lives of the mobile home parks, as for example, the private roads which spread throughout both projects.

Having commented on the depreciability or non-depreciability of the general categories of expenditures involved, the Court will consider the question of the depreciability of each expenditure in dispute as listed on plaintiffs' exhibits 10 and 11.

In dispute in all three years with regard to Pot-Nets and Indian Landing are payments to the Melvin L. Joseph Construction Company which the plaintiffs attempted to capitalize. The payments for work at Pot-Nets amount-

ed to $14,251.18 in 1966, $1,664.76 in 1967 and $2,539.50 in 1968. The payments for work at Indian Landing amounted to $7,851.70 in 1966, $8,510.84 in 1967 and $3,751.27 in 1968. Apparently these expenditures involved bulldozing trees, building roads and general grading.[29] As the Court discussed previously, the costs of clearing trees and building roads are depreciable, while general grading expenditures are not. However, the plaintiffs did not establish which portion of the expenditures went into activities for which depreciation may be allowed. Since they have the burden of proving that the Government's assessment against them was erroneous, Psaty v. United States, supra, 442 F.2d at 1158, they have the burden of proving that portion of each expenditure which may be depreciated. Having failed to meet their burden of proof on these expenditures, they will not be allowed to depreciate them.

There were payments to Wingate & Eschenbach, a civil engineering firm for work at Pot-Nets in the amount of $1,771.85 in 1966 and $876.20 in 1967. The work performed was designing and laying out lagoons and staking out mobile home lots.[30] Since the Court has held that lagoons are depreciable, the costs of designing them are also depreciable. The boundaries of the mobile home lots will be valueless when the projects cease to exist so that the cost of establishing the boundaries is depreciable over the useful life of the projects. Therefore all of the payments to Wingate & Eschenbach may be depreciated.

Payments to Van Demark & Lynch, Inc., another engineering firm, for similar services performed at Indian Landing[31] in the amounts of $4,837.60 in 1966, $3,507.25 in 1967, and $1,177.50 in 1968 may likewise be depreciated.

The remaining "land improvement" expenditures at Pot-Nets for land improvements were $397.63 paid to Indian

29. Tr. 148.
30. Tr. 72–73.

31. Tr. 148.

Landing for digging and $364.00 to Kackle Farm, apparently for bulldozing. Since neither of these expenditures were proven to be attributable to depreciable features of the project, no depreciation will be allowed.

The dredging costs for the lagoons at Pot-Nets amounting to $25,500.00 paid to Breakwater Dredging Co. in 1967 may be depreciated; in the same vein $79,319.00 for dredging the lagoons at Indian Landing paid to Cottrell Engineering in 1966 is depreciable.

The following "land improvement" payments made on behalf of Indian Landing are depreciable because their value is tied to the useful life of the project: $455.00 to the Mobile Home Manufacturers Association in 1966 for designing lot sizes;[32] $25.00 in 1966 for aerial photos; $217.20 to Joseph Forst in 1967 for markers for lot corners;[33] $206.35 to Graves Block & Supply Co. in 1967 for concrete squares to cover water valves;[34] $155.00 to Don Penuel & Lankford Sign Co. in 1967; $92.19 to Delaware Electric Cooperative, Inc. in 1967; $45.00 to Thoro-Good Concrete Co. in 1968; and $82.50 to Seaboard Lumber Co. in 1968.

The following "land improvement" payments made on behalf of Indian Landing are not depreciable: $316.38 to James Blackwell in 1966 for land clearing;[35] $650.00 to Richard M. Calhoun in 1967; $88.50 to Harold L. Johnson in 1967; and $100.25 to Kackle Farms in 1968.

■ Of the $6,819.34 item originally listed as a maintenance expense of Pot-Nets now sought to be treated as a capital expenditure, $3,422.00 paid to the Melvin L. Joseph Construction Corp. was proved to be attributable to building

roads and may be depreciated.[36] Of the remainder, $2,976.95 [37] appears to have gone to hand clearing of woods that had become overgrown during a period of neglect after it had been bulldozed. Since what apparently was removed was underbrush and not valuable trees, its removal would appear to increase the value of the land itself, and hence is not depreciable.[38] The remaining $420.39 was not accounted for and may not be depreciated.

The Court will now consider the remaining issue raised by the plaintiffs. The plaintiffs argue that the Government is estopped from asserting that the land improvement expenses are not depreciable. They claim that they entered into the ventures here involved only because they believed that all the expenses in dispute would be depreciable, and that their reliance was based upon certain Guidelines for Depreciation ("Guidelines") issued by the IRS in 1962,[39] which suggest a useful life of twenty years for canals, waterways, landscaping, shrubbery and similar improvements.[40] The plaintiffs argue that the Government is estopped from taking a position adverse to its earlier promulgated Guidelines.

■ The Court does not agree. The Guidelines were designed to provide a businessman with a reasonable advance assurance of the useful life of a depreciable asset acceptable to the IRS. Stevens Realty Co. v. Commissioner, 276 TCM 528, 530 (1967). They were not intended to be a dispositive statement that the assets listed would be depreciable in every instance. In fact, the Guidelines state that the depreciation schedule has no relevance to whether a particular expenditure can be treated as

32. Tr. 137.

33. Tr. 149.

34. Id.

35. Tr. 109.

36. Tr. 20, 23.

37. $1,679. went to James Blackwell and the remainder was in small payments to un-

named laborers in the amounts of $145.00, $161.46, $60.84, $223.30, $42.12, $79.78, $280.00, and $305.45. Tr. 24–25; 80.

38. The plaintiffs' original treatment of this amount as a current expense would appear to have been correct.

39. Revenue Ruling 62–21, Px. 21.

40. Px. 21, p. 11.

a capital expenditure recoverable through depreciation.[41] Since the Guidelines make clear that they should not be relied upon as an assurance that the listed assets were depreciable, the taxpayers were not misled to their detriment and the Government is not estopped from asserting that the expenditures in dispute are not depreciable.

The above shall constitute findings of fact and conclusions of law as required by Rule 52(a), F.R.Civ.P.

Submit order.

---

41. Px. 21, p. 54:

33. "Question: Questions often arise as to whether particular expenditures are deductible expenses or are capital expenditures which should be recovered through depreciation. How does this depreciation reform affect the resolution of these questions?

Answer: The depreciation reform does not affect the classification of expenditures as capital or expense. Questions in this area must be resolved on the basis of presently established principles. *The depreciation reform affects only those expenditures which are properly chargeable to capital and recoverable through depreciation deductions.*" (Emphasis added).