JAMES C. BRADFORD AND ELEANOR A. BRADFORD, PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 6364–70.    Filed May 22, 1973.

*William Waller* and *William E. Martin*, for the petitioners.
*Charles B. Norris*, for the respondent.

TANNENWALD, *Judge:* Respondent determined the following deficiencies in petitioners' income tax:

| Year | Deficiencies |
|------|--------------|
| 1964 | $6, 697. 96 |
| 1965 | 6, 324. 10 |
| 1966 | 5, 271. 86 |

The issue for decision is whether, within the meaning of section 265 (2) of the Internal Revenue Code of 1954, any of the indebtedness of a partnership, doing business as a broker and dealer in securities, was incurred or continued to purchase or carry tax-exempt bonds.

FINDINGS OF FACT

Some of the facts have been stipulated. The stipulation of facts and attached exhibits are incorporated herein by this reference.

Petitioners James C. Bradford and Eleanor A. Bradford, husband and wife, resided in Nashville, Tenn., when they filed their petition herein. Their joint Federal income tax returns for the calendar years 1964, 1965, and 1966 were filed with the district director of internal revenue, Nashville, Tenn. Eleanor A. Bradford is a petitioner herein only by virtue of having joined in said returns. Accordingly, any reference to petitioner will be deemed to mean James C. Bradford.

Petitioner was a partner in J. C. Bradford & Co. (hereinafter referred to as Bradford), a partnership that kept its books and filed partnership information returns for Federal income tax purposes using the cash method of accounting and the calendar year as its annual accounting period.

Bradford's business consisted of buying and selling securities, either as a broker for its customers or as a dealer for its own account; underwriting new issues of taxable securities and tax-exempt bonds; loaning to its customers on margin to finance their purchase of securities; and providing investment and financial counseling. The firm also purchased and held taxable securities for its own account.

Bradford purchased tax-exempt bonds only as a dealer for resale to customers and never with the intent to hold them as investments for its own account. It participated in syndicates that underwrote new issues of such bonds, marketing them primarily to banks and other institutional investors. Over 90 percent of the tax-exempt bonds that Bradford underwrote were resold to customers before Bradford was required to pay the issuer for them. Bradford also purchased blocks of tax-exempt bonds on the open market, ordinarily reselling them to a customer before Bradford was required to pay for its purchase. Bradford maintained a market for its customers in the tax-exempt bonds that it underwrote or in which it dealt. This activity consisted of buy-

ing back such bonds from a customer and reselling them to another customer as quickly as possible. In addition to these activities as a dealer in tax-exempt bonds, Bradford would also act as a broker for its customers in the purchase and sale of tax-exempt bonds.

Bradford carried tax-exempt bonds only from the date it paid for the bonds it purchased until the date it was supposed to deliver them to a new purchaser (the settlement date). On the settlement date, Bradford credited the bonds to the customer's account and debited an account receivable from the customer in the amount of the purchase price plus any interest accrued to the settlement date. During the years in issue, the interval between the date of sale and the settlement date was set at 4 business days, but actual delivery of the bonds was sometimes delayed for several days because of the distant location of the purchaser or for up to a month because of a need to effect the transfer of registered bonds. Bradford's institutional customers paid for the bonds they purchased only upon actual delivery of the bonds. Bradford's individual customers would ordinarily make payment on the settlement date and the bonds would be delivered later or held in safekeeping for the customer.

Bradford collected any interest receivable on the tax-exempt bonds it held and reported it on its partnership returns as tax-exempt interest income in the amounts indicated on page 256 *infra*.

Bradford never pledged tax-exempt bonds as security for any of the indebtedness it incurred.

Bradford loaned to customers on margin to finance their purchase of securities. Customers never borrowed on margin, however, to finance the purchase of tax-exempt bonds. Bradford generally charged its customers an interest rate on margin loans that was one-half of 1 percent above the rate of interest that Bradford paid on its own borrowings. Because the banks which lent to Bradford usually required a compensating balance equal to 20 percent of the loans, the rate of interest that Bradford charged its customers on margin loans was not in itself sufficient to offset the cost of Bradford's own borrowings. For competitive reasons, nevertheless, Bradford found it necessary to carry margin accounts and the brokerage commissions generated from these accounts resulted in an overall profit for the firm.

Generally, all cash receipts and disbursements of Bradford were deposited and withdrawn daily from various general-purpose checking accounts. Bradford's deposits in these accounts included proceeds from its bank borrowings, receipts from sales of securities owned by both Bradford and its customers, cash advances by customers, cash from other brokers taken as collateral for securities that Bradford loaned to them, and cash from advances and capital contributions from

partners. Disbursements from the accounts included payment for purchases of securities by both Bradford and its customers, cash withdrawals by customers, payment of principal and interest on loans to banks and subordinated lenders, payment of amounts due to other brokers, and replenishment of funds and special checking accounts maintained to pay operating expenses of Bradford.

In Bradford's general-purpose checking accounts, funds were commingled so that the source of such funds could not be traced through the accounts to any particular application of the funds. For example, the proceeds from bank loans were commingled in the general account with all of Bradford's other cash receipts; then, from such accounts, Bradford, among other things, both loaned funds to customers for the purchase of securities on margin and made payments for the purchase of tax-exempt bonds.

The amount of funds that Bradford borrowed from banks was determined on a daily basis. This determination was made by a clerk who at a specific time each day would contact each section of the cashier's department to determine the amounts of receipts and disbursements to that point of the day and the amounts of receipts and disbursements that could be expected for the remainder of the day. If total disbursements for the day were expected to exceed total receipts, Bradford would borrow from banks the amount needed to maintain a reasonable cash position. If total receipts for the day were expected to exceed total disbursements, Bradford would repay to the banks the amount not needed to maintain a reasonable cash position. No specific check was made of the amounts of receipts and disbursements from sales and purchases of tax-exempt bonds, nor was a specific check made of the amounts of debit balances in customers' margin accounts.

The average monthly value of Bradford's assets was $26,294,700 in 1964 and $26,760,444 in 1966. The average monthly value of all tax-exempt bonds owned by Bradford was $605,658 in 1964 and $736,191 in 1966, including tax-exempt bonds contributed to Bradford by its partners in the amount of $150,840 in 1964 and $155,680 in 1966. The average monthly amounts due to Bradford from its customers, including the debit balances of customers' margin accounts, was $7,393,890 in 1964 and $9,207,000 in 1966. Actual figures in regard to these items are unavailable for the year 1965, but the parties have stipulated that the average of the 1964 and 1966 figures may be deemed to be the figures for 1965.

On its partnership information returns, Bradford reported gross income of $1,418,748 in 1964, $4,679,658 in 1965, and $1,966,532 in 1966. In addition, Bradford's returns showed tax-exempt interest income of $22,050.59 in 1964, $57,210.85 in 1965, and $19,253.73 in 1966.

Bradford paid interest on its indebtedness in the total amount of $355,965 in 1964, $494,445 in 1965, and $544,377 in 1966, and deducted these entire amounts as interest expense on its partnership returns for the respective years.

Respondent determined that a portion of Bradford's interest expense in each year was not allowable as a deduction, because it was, within the meaning of section 265(2),[1] interest on indebtedness incurred or continued to purchase or carry tax-exempt bonds.

Respondent computed such unallowable portion by multiplying the total interest expense paid by Bradford in each year by a fraction: (a) The numerator of which was the average monthly value during the year of tax-exempt bonds owned by Bradford, and (b) the denominator of which was the average monthly value during the year of Bradford's total assets less the capital contributed by the partners.

The amounts thus computed were $17,203 for 1964, $22,471 for 1965, and $23,171 for 1966. Respondent limited the amount of the disallowance for 1966, however, to $19,253.73, the amount of tax-exempt interest income reported by Bradford for that year.

As a consequence of the disallowance under section 265(2), respondent determined that petitioner had understated his distributive share of the partnership's income by $8,755.51 in 1964, $8,854.43 in 1965, and $7,531.22 in 1966.

### OPINION

This case presents the occasion for a reappraisal of *John E. Leslie*, 50 T.C. 11 (1968), and the Second Circuit's subsequent reversal of that decision, 413 F.2d 636 (C.A. 2, 1969). Petitioners draw no distinction between the material facts of the instant case and those in *Leslie*, and we perceive none.[2]

In *Leslie*, as here, the partnership incurred and repaid indebtedness on a day-to-day basis in order to carry on its securities business, including the purchase and sale of tax-exempt bonds. Respondent disallowed as a deduction a portion of the partnership's interest expense accrued on such indebtedness, on the grounds that the indebtedness was "incurred or continued to purchase or carry" tax-exempt bonds, within the meaning of section 265(2).

At the threshold of our analysis in *Leslie*, we rejected the mechanical notion that section 265(2) is activated simply by a finding that the

---

[1] Sec. 265, I.R.C. 1954, provides that:
No deduction shall be allowed for—

&ast;  &ast;  &ast;  &ast;  &ast;  &ast;  &ast;

(2) INTEREST.—Interest on indebtedness incurred or continued to purchase or carry obligations &ast; &ast; &ast; the interest on which is wholly exempt from the taxes imposed by this subtitle. &ast; &ast; &ast;

[2] Facts relating to the computation of the disallowance are discussed below.

taxpayer has incurred or continued debt at the same time that he holds tax-exempt bonds, 50 T.C. at 21. Instead, we stated the applicable test as being whether the indebtedness was incurred or continued for the *purpose* of purchasing or carrying tax-exempt bonds. We then proceeded to find for the taxpayer, relying on the facts that the partnership never intended to hold the tax-exempt bonds as an investment and never consciously considered that it could decrease the amount of its indebtedness by ceasing to hold tax-exempt bonds. 50 T.C. at 21–22.

On appeal, the Second Circuit agreed that the proper test was the *purpose* of incurring the indebtedness, but disagreed with our application of that test. In the opinion of the appellate court, the partnership therein borrowed to accommodate all the needs of its business, including the intended purchases of tax-exempt bonds. Accordingly, the court sustained the Commissioner's disallowance of an allocable portion of the partnership's interest deduction.

The critical difference between our approach and that of the Second Circuit Court of Appeals is revealed by the following key sentences in the two opinions:

(1) This Court (50 T.C. at 21):

Thus, there was some relationship between its [the partnership's] indebtedness and its holding in tax-exempts—if it had held no tax-exempts, it would have had to borrow less. Nevertheless, we think that the circumstances of this case do not support an inference that indebtedness was incurred to purchase the tax-exempt holdings.

(2) The Second Circuit Court of Appeals (413 F.2d at 639–640):

Had Bache not held the tax-exempt securities, its monthly average assets would be decreased by $1,935,522.67, and it presumably would incur decreased indebtedness in that amount, and thence decreased interest expense.

Moreover, the fact that money was borrowed "in the conduct of Bache's large and many-sided business activities" by no means negates the existence of a purpose, to the extent that the borrowing allowed Bache to deal in and retain a portion of the tax-exempts. To the contrary, in computing its daily cash needs for the purposes of borrowing, Bache took into account the amount of intended purchases of tax-exempt securities. * * *

Thus, there is no question that the requisite purpose must first be found. If the borrowings are clearly for nontainted purposes, the deduction is allowed even though the taxpayer may in fact own tax-exempt securities. *Edmund F. Ball*, 54 T.C. 1200 (1970). Equally clearly, the deduction is not allowable if the proceeds of the borrowing are directly traceable to the purchase of tax-exempts, *Kirchner, Moore & Co.*, 54 T.C. 940, 951 (1970), affd. 448 F.2d 1281 (C.A. 10, 1971); *Wynn* v. *United States*, 288 F.Supp. 797 (E.D. Pa. 1968), affirmed per curiam 411 F.2d (C.A. 3, 1969).

The instant situation, like that in *Leslie*, falls in between these two extremes. Petitioner argues that it borrowed simply for the purpose of maintaining bank balances necessary to carry on its business and that to disallow a portion of the interest deduction under such circumstances is to substitute a mechanical allocation for the "purpose" test mandated by section 265(2).

Petitioners' approach is far too simplistic. It would enable Bradford to escape the strictures of section 265(2) simply because it deals in *both* taxable securities and tax-exempt bonds, unlike the dealer in only tax-exempt bonds in *Kirchner, Moore & Co., supra*, and commingles the receipts and disbursements relating to all aspects of its business, unlike the dealer in *Wynn* v. *United States, supra*, which maintained a separate bank account for its purchases and sales of tax-exempt bonds and related borrowings. As the Second Circuit said in *Leslie:*

"Allocation" in Section 265(1) should not be confused with allocation in order to determine the measure of the disallowance in a situation where it was not possible to trace borrowed money directly to the holdings of tax-exempt securities. Once a determination under Section 265(2) is properly made, i.e., that a portion of the indebtedness was incurred or continued to purchase or carry tax-exempt securities, the purpose requirement is satisfied, and the fact that allocation is employed as a fairer measure of the appropriate disallowance than disallowing the entire interest on the outstanding debt does not take the interest expense out of Section 265(2). * * * [Fn. omitted. See 413 F.2d at 640–641.]

Nor are we impressed with petitioner's attempts to bootstrap themselves to a favorable decision herein by arguing that: (1) Section 265(2) on its face makes no distinction between different classes of taxpayers; (2) section 265(2) has been considered as not applying to banks; [3] (3) Bradford's activities in connection with tax-exempt bonds are the same as those of banks; (4) *ergo*, section 265(2) does not apply to Bradford. We see no need to explore or express any opinion either directly or by inference as to the relationship between section 265(2) and banks. It is enough to note at this point that there are obvious and significant differences between banks and brokerage firms and between the relationships between banks and their depositors and brokerage houses and their customers.[4]

In short, upon further reflection, we have concluded that the approach of the Second Circuit in *Leslie*, which permits the proscribed

---

[3] See *John E. Leslie*, 50 T.C. 11, 22–23 (1968) ; *Leslie* v. *Commissioner*, 413 F.2d 636, 640 (C.A. 2, 1969) ; Rev. Rul. 61–163, 1961–2 C.B. 58 ; Rev. Proc. 70–20, 1970–2 C.B. 499. See also H. Rept. No. 704, 73d Cong., 2d Sess., pp. 21–22 (1934) ; S. Rept. No. 591, 73d Cong., 2d Sess., p. 24 (1934).

[4] Petitioners have not argued that any difference in treatment between banks and brokerage firms under sec. 265(2) would amount to unconstitutional discrimination. Cf. *United States* v. *Maryland Savings-Share Ins. Corp.*, 400 U.S. 4, 6 (1970) ; *Michael P. Nammack*, 56 T.C. 1379 (1971), affirmed per curiam 459 F.2d 1045 (C.A. 2, 1972).

purpose to be inferred from a continuous course of conduct involving borrowings and the acquisition of tax-exempt securities, represents the better view. Accordingly, we hold that a portion of Bradford's interest expense was properly disallowed.

We now turn to the further question of how the disallowed portion is to be determined. In their preoccupation with the primary issue of deductibility, the parties have given scant attention to the proper formula to be utilized and particularly to the ramifications of the formula contained in Rev. Proc. 72–18, 1972–1 C.B. 743 (sec. 7.02). Such being the case, we will abjure any attempt to deal with that revenue procedure in its totality and confine ourselves to the two specifics on which the parties are at odds.

Petitioners first contend that the multiplicand to which the allocation fraction is applied should exclude interest expense incurred in Bradford's brokerage business for carrying the debit balances in customers' margin accounts, with a corresponding elimination of the amount of such balances from the denominator of the fraction.[5] The parties have stipulated that Bradford determined its daily borrowings on an aggregate basis, without any specific accounting of the amount required for any particular activity of the firm, including the making of margin loans to customers. See p. 256 *supra*. We find it difficult to reconcile that stipulation with the parties' further stipulation of amounts for each year in question classified as "interest expense to carry customers' debit balances."[6] We find it unnecessary, however, to resolve that apparent conflict because, as respondent points out, "customers' debit balances" are not equivalent to the debit balances of customer margin accounts. In fact, it appears from the record that a customer's debit balance could result, for example, whenever a customer has purchased tax-exempt bonds from Bradford, but not paid for them by the settlement date. Thus, petitioners have not sustained their burden of proof that the stipulated amounts are not attributable to the purchase or carrying of tax-exempt securities. Consequently, those amounts should properly be included in the multiplicand to which the allocation fraction is applied.

Petitioners next contend that the denominator of the allocation fraction should be Bradford's total assets, including the partners' contribution to capital. Respondent states that the partners' capital accounts were originally excluded from the denominator because the capital contributed by the partners could not have generated borrow-

---

[5] Cf. respondent's position published in Rev. Proc. 72–18 that the amount of the disallowance should be reduced by "the amount of any indebtedness the interest on which is not subject to disallowance to any extent."

[6] Such amounts are $316,089 for 1964, $393,442 in 1965, and $479,688 in 1966, based on the average cost of borrowing money for the respective years.

ing. However, he recognizes that since the issuance of the statutory notice in this case, Rev. Proc. 72–18, *supra*, has been published and specifies that the fraction to be used in computing the disallowance is, as the numerator, "the average amount during the taxable year of the taxpayer's tax-exempt obligations (valued at their adjusted basis),'' and, as the denominator, "the average amount during the taxable year of the taxpayer's *total assets* (valued at their adjusted basis).'' (Emphasis added.)

Respondent's only reasons for denying to petitioners the benefit of the larger denominator specified in Rev. Proc. 72–18, *supra*, seem to be that the deficiency notice antedated the revenue procedure, that petitioners have not shown the adjusted basis of Bradford's tax-exempts and total assets, and that, therefore, petitioners have again failed to satisfy the burden of proof that the deficiency notice is incorrect. The record indicates that in computing the "value" of its assets, Bradford used cost for some and "market value" for others and that respondent accepted this hybrid method in evolving the fraction applied to determine the amount of disallowed interest in the deficiency notice. We think it likely that respondent's decisional process on the issue of inclusion or exclusion of partners' capital accounts in the denominator of the fraction was directed toward considerations of policy, including questions of administrative convenience relating to problems of tracing the origins of the amounts in such accounts, rather than any question of value vs. basis, and that manifestations of that process may well have moved back and forth until Rev. Proc. 72–18, *supra*, was finally issued. We see no reason to permit respondent to disavow his revenue procedure for the purposes of this case solely because of a technical failure of proof on the part of petitioners for which respondent may well have been partially responsible. Without indicating whether partners' capital accounts should under all circumstances be included in the denominator of the applicable fraction, we hold that Rev. Proc. 72–18, *supra*, should be applied so as to include those accounts for the purpose of this case.

Reviewed by the Court.

*Decision will be entered under Rule 50.*

---

DRENNEN, *J.*, dissenting: I agree with Judge Dawson's dissent on the merits of the issue involved. I would like to state an additional reason why I think the action of the majority is wrong.

The question of whether this Court should follow a reversal by a Court of Appeals was carefully considered in the opinion of this Court in *Arthur L. Lawrence*, 27 T.C. 713 (1957), revd. 258 F. 2d

562 (C.A. 9, 1958), and cogent reasons were stated why we should not always do so; primarily that being a national court with jurisdiction in tax matters alone, we believed that Congress expected the Tax Court to set precedents for the uniform application of the tax laws, insofar as it would be able to do so. That opinion also suggested the procedure that should be followed after a Court of Appeals had reversed its prior decision on that point. That procedure was stated thusly:

Clearly, it [the Tax Court] must thoroughly reconsider the problem in the light of the reasoning of the reversing appellate court and, if convinced thereby, the obvious procedure is to follow the higher court. But if still of the opinion that its original result was right, a court of national jurisdiction to avoid confusion should follow its own honest beliefs until the Supreme Court decides the point. * * * [Fn. omitted.]

While the procedure set forth in the *Lawrence* case was modified in *Jack E. Golsen*, 54 T.C. 742 (1970), affd. 445 F. 2d 985 (C.A. 10, 1971), certiorari denied 404 U.S. 940 (1971), the basic tenet of the *Lawrence* rule was not disturbed. In *Golsen* we stated:

it is our best judgment that better judicial administration requires us to follow a Court of Appeals decision which is squarely in point where appeal from our decision lies to that Court of Appeals and to that court alone. [Fns. omitted.]

In explaining our reasons for modifying the procedure, we stated:

we think that where the Court of Appeals to which appeal lies has already passed upon the issue before us, efficient and harmonious judicial administration calls for us to follow the decision of that court. Moreover, the practice we are adopting does not jeopardize the Federal interest in uniform application of the internal revenue laws which we emphasized in *Lawrence*. We shall remain able to foster uniformity by giving effect to our views in cases appealable to courts whose views have not yet been expressed, and, even where the relevant Court of Appeals has already made its views known, by explaining why we agree or disagree with the precedent that we feel constrained to follow. [Citation omitted.]

Five years ago in *John E. Leslie*, 50 T.C. 11 (1968), revd. 413 F. 2d 636 (C.A. 2, 1969), certiorari denied 396 U.S. 1007 (1970), in a court-reviewed opinion with three dissents, this Court, under material facts with which the majority here finds no distinction from the facts in this case, held that an interest deduction is denied under section 265(2), I.R.C. 1954, only when indebtedness is incurred or continued for the purpose of purchasing or carrying tax-exempt securities, and that the circumstances present established that the indebtedness was not incurred or continued for such purpose, so the deduction was allowed. The Court of Appeals for the Second Circuit, which is not the controlling circuit in this case, while agreeing with the Tax Court that the test under section 265(2) "is whether or not there is a business 'purpose'

to purchase or carry obligations the interest on which is exempt, and to incur indebtedness therefor," concluded that we had misapplied the test and reversed. I can find nothing in the reasoning of the Court of Appeals in *Leslie* to differentiate it from the reasoning of the dissenters in this Court in the *Leslie* case. The views of the dissenters were before this Court in the *Leslie* case and they were given serious consideration but were rejected. Now, in this first case involving the same issue to come before this Court since the *Leslie* case, the majority opinion accepts the reasoning of the dissenters in *Leslie* and reverses the position of this Court on the issue. I do not understand how the same reasoning can be anymore convincing to this Court now than it was 5 years ago when we rejected it. The switch in position of this Court after our reversal will, in my opinion, lead only to confuse taxpayers and the Commissioner of Internal Revenue on what to expect from this Court when the issue comes before us the third time.

FORRESTER, FAY, DAWSON, SIMPSON, and FEATHERSTON, *JJ.*, agree with this dissent.

———

DAWSON, *J.*, dissenting: I agree with the majority's handling of respondent's argument with regard to the inclusion or exclusion of partners' capital accounts in the denominator of the applied fraction. However, I respectfully disagree with almost everything else.

In my opinion the approach taken in the majority opinion is not quite as mechanical as that which the Court refused to apply in *R. B. George Machinery Co.*, 26 B.T.A. 594 (1932), but it is still too mechanical for me. For all practical purposes, it calls for an automatic allocation of some portion of total interest expense, however small, to "disallowable" interest expense whenever the amount of a taxpayer's borrowing is actually or presumably forced up by his present or contemplated purchase or holding of tax-exempt securities. Why pretend that the purpose test is still with us? With its opinion today, the majority coaxes the purpose test out the window.

I think that where petitioners find themselves in the same position as Leslie and Bradford we should give considerable weight to the following factors: That the amounts borrowed were dictated by the amounts needed to carry on the brokerage business; that they did not borrow more so as to purchase or carry tax-exempts; that they did not consider that they would have to borrow less if they sold their tax-exempts; that there was no real relationship between the amounts borrowed and the amount of tax-exempts purchased; that they purchased tax-exempts only as items for resale to their customers; that they dealt in tax-exempts only to a small extent, and then only to complete the selection of securities sold by them and thus to foster all types of sales;

and that, in one sense, they lost money in financing their dealing in tax-exempts since their "disallowable" interest expense exceeded the amount of tax-exempt interest income earned. These indicate to me that the true purpose of the disputed portion of total borrowing was to conduct a brokerage business in a usual, profitable manner.

While the majority's approach is tidy, it unfortunately runs counter to the approach of Congress. In this respect I need only reiterate what we said in the not-too-distant past:

> The legislative history makes clear that section 265(2) was not intended to be applied merely on the basis of an *allocation* of indebtedness to the purchase or carrying of tax-exempt securities. A reasonable allocation may justify the application of section 265(1), but there must be more to apply section 265(2). The respondent's allocation may be reasonable, but its reasonableness does not justify the application of section 265(2). There must be a connection between the reason for incurring or continuing the indebtedness and the purchase or the carrying of the tax-exempt securities, * * *. [*John E. Leslie*, 50 T.C. 11, 22 (1968).]

The "connection" we spoke of in the *Leslie* case must be found to be legally sufficient by the exercise of judicial judgment rather than arrived at by the mere opening and closing of administrative and judge-made synapses.

In my judgment the Court of Appeals for the Second Circuit was incorrect in reasoning that the partnership of which Leslie was a member borrowed to accommodate all the needs of its business, including the intended purchases of tax-exempt securities, and thus passed the purpose test. The petitioner in this case borrowed ultimately for one purpose, i.e., to enable J. C. Bradford & Co. to carry on the brokerage business and thus to earn commissions. That is actually what happened, whether courts talk in terms of "purpose," "allocation," "ultimate purpose," "dominant purpose," or "primary purpose."

DRENNEN, FORRESTER, FAY, SIMPSON, FEATHERSTON, and STERRETT, JJ., agree with this dissent.