INDIAN TRAIL TRADING POST, INC.,[1] PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 5236-69.  Filed June 27, 1973.

*Louis E. Ackerson* and *Robert L. Ackerson*, for the petitioner.

*S. Earl Heilman* and *Christopher D. Rhodes*, for the respondent.

TANNENWALD, *Judge:* * Respondent determined a deficiency of $3,-298.84 in petitioner's income tax for the taxable year ended October 31, 1967.

The only issue remaining for our consideration is whether petitioner incurred or continued to carry indebtedness in order to purchase or carry tax-exempt, interest-bearing Kentucky State toll road bonds.

FINDINGS OF FACT

Some of the facts are stipulated and are so found.

Petitioner's principal place of business was located in Louisville, Ky., at the time its petition herein was filed. It timely filed its corporate income tax return for its fiscal year ended October 31, 1967, with the district director of internal revenue, Louisville, Ky.

During the years in question, petitioner owned 30 acres of real estate in Louisville, part of which contained a shopping center erected and

---

[1] Docket No. 4012-69, Dahlem Construction Company, Inc., and docket No. 5223-69, Joseph C. Dahlem and Jan B. Dahlem, were consolidated herewith. Subsequent to trial, decisions were entered in both dockets.

*Pursuant to a notice of reassignment sent to counsel for both parties, and to which no objections were filed, this case was reassigned by the Chief Judge on Dec. 11, 1972, from Judge Austin Hoyt to Judge Theodore Tannenwald, Jr., for disposition.

opened in 1957. The undeveloped section of this tract was not subject to any mortgages or liens prior to January 13, 1966.

In the fall of 1964, petitioner and F. W. Woolworth Co. (Woolco) began negotiations for the construction of a Woolco store on the undeveloped section. In contemplation of that construction, petitioner, in late 1964 or early 1965, expended approximately $113,000 to enclose a drainage ditch which traversed the land. Petitioner also purchased $24,000 worth of structural steel with which it planned to add a second floor to the store. In March of 1965, petitioner and Dahlem Construction Co., Inc. (Dahlem), agreed that the latter would build the Woolco store on petitioner's premises. Petitioner obtained interim construction financing in the amount of $630,000 from the Citizens Fidelity Bank & Trust Co. (Citizens) and a commitment from Commonwealth Life Insurance Co. (Commonwealth) for up to $1,100,000 of permanent financing.

Construction began on the Woolco store in March of 1965. Shortly thereafter, W. T. Grant Co. (Grant), a tenant in the older portion of the shopping center, and petitioner became embroiled in litigation over whether the Woolco store was being built in violation of Grant's lease; petitioner brought an action to prevent Grant from interfering with the construction of the Woolco store, while Grant sued petitioner for $1 million damages.

Dahlem completed the major part of its work in July of 1965, and petitioner paid it $834,848, using the Citizens loan and its own funds on hand for that purpose.

Petitioner borrowed $1,100,000 at 5½-percent interest from Commonwealth on or about January 13, 1966, represented by two promissory notes. The first note, for $933,300, provided for a payout period commencing February 13, 1966, with monthly payments on account of principal and interest as follows: months 1 through 50, $4,277.63; months 51 through 215, $8,034; month 216, the balance thereof. Petitioner had the right to prepay without penalty up to $220,000 within the first 7 years of the note and within any 1 year, the right not being cumulative for other years. The second note, for $166,700, provided for 49 monthly installments of $3,756.37 and one final installment for the balance. Petitioner had the right to prepay without penalty this note in whole or in part at any time upon 30 days' written notice to Commonwealth. The larger of the notes was secured by a first mortgage on the Woolco property, "a conditional assignment of rentals of even date on real estate situated and lying in Jefferson County, Kentucky, and a security pledge agreement." The smaller note was similarly secured except for a second mortgage on the Woolco property instead of a first mortgage.

Petitioner used the proceeds of the Commonwealth loan to pay Citizens $630,000 principal and $12,490 interest in full payment of that obligation. The balance was placed in petitioner's general corporate bank account. Some time in January 1966, petitioner purchased some unimproved real estate adjoining the shopping center for $100,632, using funds from its general corporate account.

In or about February 1966, petitioner invested the sum of $100,000 in a savings certificate of account at Greater Louisville First Federal Savings & Loan Association, Louisville, Ky., and a like sum in Jefferson Federal Savings & Loan, Louisville, Ky. These two institutions are federally chartered and are insured savings and loan institutions whose dividends or interest constituted taxable income to the petitioner under the applicable sections of the Internal Revenue Code.

On July 12, 1966, petitioner withdrew $50,000 from Greater Louisville First Federal, and on July 18, 1966, it withdrew a like sum from Jefferson Federal. The $100,000 so withdrawn was deposited in its general corporate bank account.

In early August 1966, petitioner made two purchases of $150,000 worth of Kentucky toll road bonds. It paid $50,263.89 for one purchase and $100,527.78 for the other. These bonds were still owned by petitioner at the time of trial.

The litigation with Grant was settled some time after October 10, 1967, for $350,000, of which petitioner paid $175,000 plus $50,000 in attorney fees. Woolco paid the other half of the settlement amount and, in return, was released from its obligations under the lease with petitioner. Woolco then vacated the store and petitioner spent $60,000 to remodel it for the next tenant, losing 3 months' rent in the process.

Petitioner's balance sheet for its fiscal year ended October 31, 1967, reflected the following:

| Assets: | Beginning of taxable year | End of taxable year |
|---|---|---|
| Cash | $52, 584 | $82, 363 |
| Investments | 561, 433 | 601, 734 |
| Liabilities: | | |
| Accounts payable | $5, 491 | $5, 345 |
| Mortgages, notes, etc., due within 1 year | 114, 295 | 120, 602 |
| Other current liabilities | 91, 337 | 87, 272 |

Total assets exceeded total liabilities by over $500,000 during fiscal 1967.

In his notice of deficiency, respondent disallowed interest in the amount of $8,250 (5½ percent × $150,000, the face value of the bonds) because the indebtedness which generated this deduction was "incurred or continued * * * to purchase" tax-exempt bonds.

OPINION

Section 265(2) of the Internal Revenue Code of 1954 disallows a deduction for interest "on indebtedness incurred or continued to purchase or carry" tax-exempt obligations. It is now well settled that the statutory disallowance is not activated merely by the simultaneous existence of an indebtedness and the holding of tax-exempt obligations. *James C. Bradford*, 60 T.C. 253 (1973). Thus, a taxpayer is not automatically required to liquidate such obligations to obtain needed funds rather than retain such obligations and obtain those funds by way of independent borrowing. *Wisconsin Cheeseman, Inc.* v. *United States*, 388 F. 2d 420, 423 (C.A. 7, 1968); *Norfolk Shipbuilding & Drydock Corp.* v. *United States*, 321 F. Supp. 222 (E.D. Va. 1971); *Edmund F. Ball*, 54 T.C. 1200 (1970). On the other hand, it is equally clear that a taxpayer cannot insulate himself from the prohibition of section 265(2) by merely juggling the use of his available assets so as to create a surface sanitation of the indebtedness from the acquisition or holding of the tax-exempt obligations. *Illinois Terminal Railroad Co.* v. *United States*, 375 F. 2d 1016 (Ct. Cl. 1967); *Constance M. Bishop*, 41 T.C. 154 (1963), affd. 342 F. 2d 757 (C.A. 6, 1965).

The touchstone for decision is the *purpose* of the taxpayer in incurring or continuing the indebtedness (*James C. Bradford, supra*) and the burden of proof is on the petitioner (*Wisconsin Cheeseman, Inc.* v. *United States*, 388 F. 2d at 423; *Bishop* v. *Commissioner*, 342 F. 2d 757, 759 (C.A. 6, 1965); Rule 32, Tax Court Rules of Practice). As we pointed out in *John E. Leslie*, 50 T.C. 11, 20–21 (1968), reversed on other grounds 413 F. 2d 636 (C.A. 2, 1969):

The finding of the taxpayer's purpose does not depend solely upon looking into his mind and learning what he was thinking; although his intentions are relevant, purpose may be inferred from his conduct and from the circumstances that confronted him. * * *

To these elements may be added the further element of timing, which "can be just as important to the taxpayer as it is to the athlete or comedian." See Barton and Voegelin, "Interest Deduction in Tax Planning," 1959 So. Cal. Tax Inst. 751, 769 fn. 63. Expressed in another way, the deduction will be barred if there is "a sufficiently direct relationship" between the incurring or continuing of the indebtedness and the acquisition or holding of the tax-exempt obligations. *Illinois Terminal Railroad Co.* v. *United States*, 375 F. 2d at 1021; *Norfolk Shipbuilding & Drydock Corp.* v. *United States*, 321 F. Supp. at 230; *Edmund F. Ball*, 54 T.C. at 1207. In essence, the existence of "a sufficiently direct relationship" is a step along the path leading to the determination of the taxpayer's purpose within the *Leslie* frame of reference.

Against the foregoing backdrop, we proceed to a consideration of the various elements involved herein, recognizing that, in the final analysis, our decision turns upon a factual determination in light of the circumstances of the particular case. See *Bishop* v. *Commissioner*, *supra.*

The lapse of some 8 months between the borrowing from Commonwealth and the purchase of the tax-exempt bonds militates to a degree against the conclusion that petitioner incurred the indebtedness to purchase the bonds. Cf. *Constance M. Bishop*, 41 T.C. at 159. On the other hand, the facts indicate that the borrowing generated cash in excess of petitioner's current business needs and in an amount greater than the purchase price of the bonds, and there is nothing in the record herein to show that this situation did not obtain throughout the period between the borrowing and the purchase.[2] Under these circumstances, it might be said that there is a sufficient degree of tracing present to justify the inference that, whatever petitioner's original purpose may have been, it became so diffused by the act of allowing the funds to lie fallow that the actual use of the funds for the acquisition of the bonds provided the necessary purposive connection with the earlier borrowing. Cf. *Constance M. Bishop*, *supra*; *Bernard H. Jacobson*, 28 T.C. 579 (1957), where this Court also held that the mere fact that funds were commingled with other funds was not sufficient to insulate the taxpayer. That petitioner utilized the borrowed funds to reimburse itself for prior expenditures does not require a different conclusion in the absence of any evidence that such reimbursement was necessary to enable petitioner to finance the ongoing current requirements of its business.[3]

But there is no necessity to rest our decision solely on the ground that the prohibition of section 265(2) applies because the proceeds of the initial borrowing can be traced to the purchase of the tax-exempt bonds and, therefore, the requisite relationship and purpose of such borrowing has been established. An examination of the facts and circumstances herein indicates that the indebtedness of petitioner to Commonwealth was "continued" for the proscribed purpose.

Here the sequence of events is one in which the acquisition of the tax-exempt bonds followed rather than preceded the borrowing. In August 1966, when the bonds in question were purchased, it is clear that, at least to the extent of the purchase price, petitioner had cash in excess of the current requirements of its business and that this cash could have been used to pay down the indebtedness to Commonwealth.

---

[2] In February 1966, $200,000 was invested in savings and loan associations and the $100,000 withdrawn from these investments was placed in petitioner's general corporate bank account less than 1 month before the bonds were purchased.

[3] The record is devoid of evidence as to any such requirements.

Petitioner chose instead to use that cash in order to acquire the bonds. It seeks to justify its action by pointing to the allegedly favorable interest rate on the indebtedness [4] and the need for cash to cover any adverse judgment which Grant might obtain in the pending litigation, to meet the balloon payments on existing indebtedness at some indeterminate point in the distant future,[5] and to have funds on hand for future expansion. But even if petitioner's business-oriented reasons are accorded full creditability, they looked to the future and, in such a context, do not necessarily justify the use of funds to acquire tax-exempt obligations while simultaneously carrying the indebtedness to Commonwealth.[6] The more important element is the fact that the funds were invested in tax-exempt bonds (which petitioner itself admits was "a good investment") and not "the ultimate plan or purpose for the subsequent disposition of such bonds." See *Kirchner, Moore & Co.*, 54 T.C. 940, 952 (1970), affd. 448 F. 2d 1281 (C.A. 10, 1971). See also *Illinois Terminal Railroad Co.* v. *United States*, 375 F. 2d at 1022. Such a situation is to be sharply contrasted with one where there is a preexisting holding of tax-exempt obligations and the borrowing is undertaken to meet immediate cash needs. *Wisconsin Cheeseman, Inc.* v. *United States, supra; Norfolk Shipbuilding & Drydock Corp.* v. *United States, supra; Edmund F. Ball, supra.* The contrast becomes even sharper when one takes into account that, at the time of the purchase of the tax-exempt bonds, petitioner was in a highly liquid position in terms of its future requirements and apparently could expect Woolco to share substantially in whatever financial obligation it might ultimately be found to have to Grant.

In short, on the basis of the entire record herein, we think that petitioner had the purpose proscribed by section 265(2) and that the deduction should be disallowed in order "to prevent the escape from taxation of income properly subject thereto by the purchase of exempt securities with borrowed money." See *Denman* v. *Slayton*, 282 U.S. 514, 519 (1931).

To reflect agreements between the parties on other issues,

*Decision will be entered under Rule 50.*

---

[4] Here again the record is, to put it mildly, extremely meager on this score.

[5] The mathematics of the two notes in favor of Commonwealth indicate that they were self-liquidating. There was some testimony that the indebtedness secured by the old section of the shopping center may have required a balloon payment in 1972, but the details of this loan are not revealed in the record.

[6] None of these needs was imbued with an aura of immediacy sufficient to endow the investment in tax-exempt bonds with a transitory quality. See *Illinois Terminal Railroad Co.* v. *United States*, 375 F. 2d 1016, 1021 (Ct. Cl. 1967), discussing Rev. Rul. 55–389, 1955–1 C.B. 276.