T.C. Memo. 1998-97

UNITED STATES TAX COURT

H ENTERPRISES INTERNATIONAL, INC., AND SUBSIDIARIES, Petitioner
v. COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 11478-93.                    Filed March 9, 1998.

W II, a subsidiary of HEI, borrowed funds, a part
of which was distributed to HEI with respect to its
stock in W II. HEI used a portion of the distribution
to buy portfolio stock and tax-exempt obligations and
held such stock and obligations for the 3 tax years in
issue. Held: the indebtedness was incurred to
purchase tax-exempt obligations for the purpose of
sec. 265(a)(2), I.R.C., and is directly attributable to
the acquisition of portfolio stock for the purpose of
sec. 246A, I.R.C.; respondent's disallowances of an
interest deduction pursuant to sec. 265(a)(2), I.R.C.
and of a dividend received deduction pursuant to sec.
246A, I.R.C., are sustained.

William L. Hippee, Jr., and Edward J. Pluimer, for

petitioner.

John Schmittdiel and Jonathon Decatorsmith, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

HALPERN, Judge: This is our second report in this case, the first also denominated H Enters. Intl., Inc., & Subs. v. Commissioner, and appearing at 105 T.C. 71 (1995) (H Enterprises I). The only issues for decision concern the applicability of sections 246A[1] and 265(a)(2) to the consolidated tax liability of petitioner. In H Enterprises I, we denied petitioner's motion for summary judgment (the motion) on the grounds that this case presented genuine issues of material fact. As grounds for the motion, petitioner argued that, as a matter of law (1) section 246A cannot be applied to disallow the dividends received deduction to a parent corporation on account of indebtedness incurred by its subsidiary corporation and (2) section 265(a)(2) cannot be applied to disallow an interest expense deduction to a subsidiary corporation on account of tax-exempt obligations purchased by its parent corporation. In H Enterprises I, we held that, in appropriate circumstances, sections 246A and 265(a)(2) may be applied when one member of an affiliated group of corporations is the borrower and another member is the purchaser of portfolio stock (sec. 246A) or tax-exempt obligations (sec. 265(a)(2)). H Enterprises I at 81. We concluded: "Whether any

---

[1] Unless otherwise noted, all section references are to the Internal Revenue Code in effect for the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.

of the borrowed funds in the present case are attributable to the purchase of portfolio stock by HEI [the parent] or were used to purchase or carry tax-exempt securities by HEI is a fact question and not one to be decided on a summary judgment motion." Id. at 85. In this report, we address the factual questions identified in H Enterprises I.

FINDINGS OF FACT

Certain facts have been stipulated and are so found. The stipulations of facts filed by the parties, with attached exhibits, are incorporated herein by this reference. Also, the Court directed the parties to review those facts set forth in H Enterprises I and provide the Court with statements of differences or objections, if any, with respect to those facts. The parties have identified as the facts set forth in H Enterprises I the facts set forth in the five consecutive paragraphs commencing with the last paragraph beginning on page 73 of volume 105, U.S. Tax Court Reports (105 T.C. at 73; the H Enterprises I facts). The parties agree with the H Enterprises I facts subject to certain common, minor, or inconsequential differences. In light of those agreements, we shall adopt the H Enterprises I facts for purposes of this report, subject to (and incorporating) the differences agreed to by the parties, and we find accordingly. In the following paragraphs of this portion of our report, we shall summarize

certain facts from H Enterprises I necessary to the clarity of our report and make additional findings of fact.

## H Enterprises International, Inc.

H Enterprises International, Inc. (HEI), is a Delaware corporation. From October 1, 1987, to March 9, 1994, the common stock of HEI was owned by Eugene U. Frey, Richard E. O'Leary, John E. Byrne, Anita M. Bertelsen, and trusts for the benefit of Eugene U. Frey's family members (collectively, the shareholders) as follows:

| | |
|---|---|
| Eugene U. Frey & Family Trusts | 50.0 percent |
| Richard E. O'Leary | 33.5 percent |
| John E. Byrne | 14.4 percent |
| Anita M. Bertelsen | 2.1 percent |

During the years in issue, HEI was the common parent corporation of an affiliated group of corporations making a consolidated return of income (the affiliated group). The taxable year of the affiliated group was a fiscal year ending on June 30.

## The Waldorf Business

On July 15, 1985, HEI purchased a business involving the manufacturing and selling of recycled paperboard, corrugated medium, and folding cartons (the Waldorf business). The purchase price was approximately $100 million. HEI financed a portion of the purchase price by borrowing approximately $82.5 million from General Electric Credit Corp. (GECC). The Waldorf business thrived under HEI's management, and, by mid-1987, according to an appraisal, the value of the Waldorf business was approximately

$210 million.  Acquisition-related debt had been reduced to less than $30 million.

The Restructuring Plan

In 1987, the board of directors of HEI (the HEI board) decided upon and implemented a plan of corporate restructuring (the restructuring plan).  A subsidiary corporation (Waldorf II) was to be formed and the Waldorf business contributed thereto in exchange for all of the stock of the subsidiary.  Subsequent to that contribution, the remaining indebtedness to GECC was to be refinanced from a larger borrowing, and a substantial distribution was to be made to HEI.

The Shareholder Agreement

In connection with the restructuring plan, on October 1, 1987, the shareholders entered into an agreement (the shareholder agreement).  Among other things, the shareholder agreement (1) recites that, effective October 1, 1987, HEI had transferred substantial assets (the Waldorf business) to its wholly owned subsidiary corporation and (2) provides for the division of HEI into four divisions:

(1)  Frey Investment Division.  The stated purposes of this Division (Investment Division I) include maintaining the "investment account/portfolio" of the Eugene U. Frey interests in any "dividend" paid by Waldorf II.  Decision making for Investment Division I is by a subcommittee of the HEI board of

directors comprised of Eugene U. Frey and "MF" (we assume, Mary Frey).

(2) O'Leary, Byrne, Bertelsen Investment Division. The stated purposes of this division (Investment Division II) include maintaining the "investment account/portfolio" of the O'Leary's, Byrne's, and Bertelsen's interests in any "dividend" paid by Waldorf II. Decision making for Investment Division II is by a subcommittee of the HEI board of directors composed of Richard E. O'Leary, John E. Byrne, and Anita M. Bertelsen.

(3) Trident Service Division. The stated purpose of the Trident Service Division is to provide various services to Waldorf II and other entities.

(4) Trident Associates Venture Management Division. The stated purpose of this division is to conduct venture management activities on its own behalf and on behalf of certain others.

Waldorf II

Waldorf Corp. (Waldorf II), a Delaware corporation, is the subsidiary corporation contemplated in the restructuring plan. On October 1, 1987, Waldorf II received substantially all of the assets of, and assumed substantially all of the liabilities relating to, the Waldorf business. During the taxable years in issue, HEI owned all of the outstanding voting shares of Waldorf II, and Waldorf II was a member of the affiliated group.

The Refinancing

On December 18, 1987, the board of directors of Waldorf II (the Waldorf II board) resolved to borrow up to $175 million from GECC. On December 23, 1987, Waldorf II borrowed approximately $113,539,873.30 from GECC (the 1987 indebtedness or the borrowed funds). At least in part, Waldorf II incurred the 1987 indebtedness in order to make a distribution to HEI with respect to its stock in Waldorf II.

The Distribution

On December 18, 1987, the Waldorf II board resolved to declare a dividend of $92 million payable to its shareholder, HEI, and, on December 23, 1987, Waldorf II made a distribution to HEI in satisfaction of that declaration of dividend (the distribution). The distribution included a cash payment to HEI in the amount of $73,803,000 (the cash distribution). The borrowed funds were used to make the cash distribution.

For Federal income tax purposes, the amount of the distribution was $123,657,000. Waldorf II had no current or accumulated earnings or profits as of June 30, 1988. To the extent of $41,250,353, the distribution was treated as a return on capital on HEI's 1988 consolidated Federal income tax return. That balance of the distribution created an "excess loss account" within the meaning of section 1.1502-14(a)(2), Income Tax Regs.

Disbursement

The cash distribution was disbursed by HEI into accounts maintained by Investment Divisions I and II and the Trident Service Division as follows: $9,803,000 to the Trident Service Division and $32 million into each of Investment Division I and II (together, the Investment Divisions).

Investments

Other than investment returns, the cash distribution was the only significant source of funds for the Investment Divisions. In January and February 1988, the Investment Divisions entered into investment management agreements with certain investment advisers and, by February 1988, began acquiring investments, including tax-exempt obligations and shares of stock in domestic corporations (domestic shares). Within approximately 3 months of receipt of their respective portions of the cash distribution, the Investment Divisions had 22.7 percent of their funds invested in tax-exempt obligations and 10.8 percent of their funds invested in domestic shares. For the years in issue, the Investment Divisions held an average of 35.3 percent of their funds in tax-exempt obligations and 23.2 percent of their funds in domestic shares. From December 1987 through the years in issue, the value of assets in Investment Divisions I and II was not less than $32 million and $31 million, respectively.

Tax-Exempt Interest; Dividends on Domestic Stock

During the taxable years in issue, HEI received interest and dividends on tax-exempt obligations and domestic shares, respectively, held by the Investment Divisions. HEI deducted 70 percent of the dividends received on those domestic shares.

Respondent's Adjustments

Respondent proposes that we make the following adjustments to petitioner's claimed interest expense deductions and dividends received deductions:

| Tax Year Ending | Interest Expense Deduction | | Dividends Received Deduction | |
|---|---|---|---|---|
| | Claimed | Disallowed Sec. 265(a)(2) | Claimed | Disallowed Sec. 246A |
| 6/30/89 | $18,197,732 | $2,891,294 | $393,201 | $393,201 |
| 6/30/90 | $17,580,023 | $3,478,858 | $587,781 | $572,329 |
| 6/30/91 | $13,862,253 | $4,380,018 | $337,410 | $337,410 |

## ULTIMATE FINDING OF FACT

Based on the restructuring plan, the shareholder agreement, and the sequence of events that followed, we find that the dominant purpose for incurring the 1987 indebtedness was to purchase tax-exempt obligations and portfolio stock.

## OPINION

### I. Introduction

We must determine whether section 246A applies to eliminate the dividends received deduction claimed by HEI with respect to dividends received on the domestic shares owned by it and whether

section 265(a)(2) applies to disallow a portion of the interest deduction claimed by Waldorf II on the 1987 indebtedness.

Petitioner's assignments of error with respect to the two issues we must decide go to the propriety of respondent's adjustments and not to the calculation of those adjustments if they are appropriate. On brief, petitioner objects to respondent's proposed finding of fact as to the interest adjustments in question by stating that the amounts set forth in respondent's proposed finding of fact "exceed the sum of the amount disallowed pursuant to the statutory notice of deficiency and the amended answer." Petitioner does not otherwise challenge respondent's proposed finding with respect to the interest adjustments in question or argue that they are in error (if, indeed, section 265(a)(2) is applicable). By the amendment to answer, respondent determined increased deficiencies on account of increased adjustments resulting from the application of section 265(a)(2). Respondent did not specify the amounts of the increased adjustments. In the reply, petitioner denies any increased deficiency but, otherwise, does not address the increased adjustments in question. We assume that the parties have a basis for calculating, and allocating, the section 265(a)(2) adjustments in question. We do not sustain any section 265(a) disallowance beyond that put at issue by the petition and the answer, as amended.

II.  Arguments of the Parties

Effectively, the parties agree that application of sections 246A and 265(a)(2) depends on the purpose (or purposes) for incurring the 1987 indebtedness.  They disagree, however, as to whether we may inquire beyond the narrow purposes of Waldorf II (the borrower) and take into account the purposes of HEI in forming Waldorf II and establishing the Investment Divisions.

Petitioner makes an argument similar to the argument it made in H Enterprises I in support of the motion.  Petitioner contends that we should look only to Waldorf II's purposes for incurring the 1987 indebtedness and to Waldorf II's use of the borrowed funds in applying sections 246A and 265(a)(2).  Petitioner would have us find that Waldorf II had purposes for incurring the 1987 indebtedness that were unrelated to its parent corporation's (HEI's) use of the distribution made from the proceeds of that indebtedness.  Although petitioner believes it is irrelevant, petitioner also argues that HEI had business reasons for acquiring and maintaining investments in tax-exempt obligations and domestic shares, including a need for liquid resources to provide capital for funding business acquisitions and to provide funds for stock redemptions, if necessary.

Respondent traces the borrowed funds to investments in tax-exempt obligations and domestic shares and argues that this is sufficient proof of the relationship between the 1987

indebtedness and the investments for purposes of sections 246A and 265(a)(2).  Respondent would have us find that Waldorf II and HEI had a "common purpose established by [HEI]", to provide funds to HEI by borrowing "in excess of the needs of the [Waldorf] business" so that HEI could invest in a variety of products, including tax-exempt obligations and domestic shares.

III.  The Code

Section 265(a)(2) provides:

> No deduction shall be allowed for * * * [i]nterest on indebtedness incurred or continued to purchase or carry obligations the interest on which is wholly exempt from the taxes imposed by this subtitle * * *

Section 265(a)(2) does not operate to disallow interest on indebtedness simply because the taxpayer simultaneously holds or acquires tax-exempt obligations and incurs or carries indebtedness.  Bradford v. Commissioner, 60 T.C. 253, 257-258 (1973).  The touchstone for decision is whether the taxpayer's purpose in incurring or continuing indebtedness was to purchase or carry such obligations.  Indian Trail Trading Post, Inc. v. Commissioner, 60 T.C. 497, 500 (1973), affd. 503 F.2d 102 (6th Cir. 1974).  Purpose may be inferred from the taxpayer's conduct and the circumstances surrounding the borrowing.  Id. (citing Leslie v. Commissioner, 50 T.C. 11, 20-21 (1968), revd. on other grounds 413 F.2d 636 (2d Cir. 1969)).

Section 246A provides that there shall be a reduction in the amount of the deduction allowable for dividends received (under sections 243, 244, or 245(a)) with respect to debt-financed portfolio stock. Debt-financed portfolio stock is defined in section 246A(c) as any portfolio stock with respect to which there is portfolio indebtedness. Portfolio indebtedness means "any indebtedness directly attributable to investment in the portfolio stock." Sec. 246A(d)(3)(A). We have found no cases that interpret the expression "directly attributable" in the context of applying section 246A. Section 246A was added by the Deficit Reduction Act of 1984, Pub. L. 98-369, sec. 51, 98 Stat. 494, 562-564. H. Rept. 98-432, which accompanied H.R. 4170, which became the Deficit Reduction Act of 1984, indicates that we should inquire into the taxpayer's purpose for incurring the indebtedness and trace the use of the borrowed money: "[I]f indebtedness is clearly incurred for the purpose of acquiring dividend-paying stock or otherwise is directly traceable to such an acquisition, the indebtedness would constitute portfolio indebtedness." Id. at 1181.

Thus, the inquiry is similar under both sections 265(a)(2) and 246A(d)(3)(A): In both cases, we must determine whether there is a sufficient purposive connection between the borrowing and the investments.

IV. <u>Discussion</u>

In H Enterprises I, we held that, in appropriate circumstances, sections 246A and 265(a) may be applied when one member of an affiliated group is the borrower and another member is the purchaser of the portfolio stock or tax-exempt securities. H Enterprises I at 81. Implicit in that holding is the recognition that the search for a prohibited purpose cannot be focused exclusively on the subsidiary's purpose in borrowing to make a distribution. Generally, a distributing corporation has no control over (or concern with) the use to which distributions are put by the shareholder recipient. If we were to limit our inquiry to whether the board of directors of a subsidiary corporation borrowed to make a distribution to its parent and whether the subsidiary used the borrowed funds for that purpose, then the use of the distributed funds would be irrelevant and the purpose of the distributing corporation would always be acceptable. We, therefore, reject petitioner's argument that we should look only to Waldorf II's purpose for incurring the 1987 indebtedness, and we direct our inquiry to the larger purposes of HEI manifest by the actions of both Waldorf II and HEI.

Here, Waldorf II incurred the 1987 indebtedness, at least in part, in order to make the distribution. Coincident, or nearly coincident, events may indicate purpose: "[T]he deduction will be barred if there is 'a sufficiently direct relationship' between the incurring or continuing of the indebtedness and the

acquisition or holding of the tax-exempt obligations." Indian Trail Trading Post, Inc. v. Commissioner, supra at 500 (citations omitted). HEI, through the Investment Divisions, used the cash portion of the distribution to purchase tax-exempt obligations and domestic shares within weeks of receiving the funds and maintained a substantial portion of its investment portfolio in such investments for the years in issue. Accordingly, we find that the borrowed funds were used directly to purchase tax-exempt obligations and domestic shares and that sections 265(a)(2) and 246A apply. See Bradford v. Commissioner, supra at 258 ("Equally clearly, the deduction is not allowable if the proceeds of the borrowing are directly traceable to the purchase of tax-exempts." (Citations omitted.)). The facts that the borrowed funds were not used by Waldorf II to purchase tax-exempt obligations and Waldorf II had a purpose for incurring the 1987 indebtedness (to make a distribution to HEI) are simply not determinative in the affiliated group context before us. We are, thus, satisfied that, here, where the borrowing and distribution are all part of a preplanned sequence, the distributed funds are distributed to a parent corporation, and those funds are used to purchase tax-exempt obligations and domestic shares, the required purposive connection has been shown.

Petitioner also argues that Waldorf II incurred the 1987 indebtedness in order to obtain more advantageous terms on its debt and to implement a new stock purchase plan for its

employees.  Neither of those reasons is inconsistent with what we find to be the dominant objective in incurring the 1987 indebtedness, to make a cash distribution to HEI in order to allow HEI to purchase tax-exempt obligations and domestic shares. See generally Leslie v. Commissioner, 413 F.2d 636 (2d Cir. 1969) (business reasons not related to the purchase of tax-exempt securities must dominate the incurring of indebtedness to insulate the borrowing from application of section 265(a)(2)), revg. 50 T.C. 11 (1968).

Petitioner argues that there is no evidence that HEI or Waldorf II contemplated investing in tax-exempt obligations or domestic shares at the time Waldorf II incurred the 1987 indebtedness and that, at the time, it made no economic sense to borrow in order to make such investments.  We cannot look into a taxpayer's mind to determine the purpose of incurring indebtedness; we must infer that purpose from the evidence. Indian Trail Trading Post, Inc. v. Commissioner, 60 T.C. 497, 500 (1973).  HEI received regular reports on the investments held in the Investment Divisions, including reports of its after-tax returns, and we are not inclined to second-guess its investment decisions.  See generally Illinois Terminal R.R. v. United States, 179 Ct. Cl. 674, 375 F.2d 1016, 1021-1022 (1967) (taxpayers need not receive economic benefits from tax-exempt securities for section 265(a)(2) to apply).

Finally, petitioner argues that HEI had business reasons for holding a liquid, diversified investment portfolio that included tax-exempt obligations and domestic shares. Petitioner relies on Swenson Land & Cattle Co. v. Commissioner, 64 T.C. 686 (1975), and points to HEI's objectives of having capital available to support possible acquisitions of other businesses in the future and having sufficient liquidity to fund redemptions in case of the death of a principal shareholder or on account of disputes among the shareholders. In Swenson, we were persuaded that the taxpayer was considering detailed and concrete proposals for expansion that justified a large contingency reserve of liquid funds. Here, HEI had no specific plans for the borrowed funds, other than funding the Investment Divisions, which were set up during the restructuring of the Waldorf business, and, although petitioner has demonstrated that there were disputes among the shareholders that may have made it advisable to plan for a stock redemption, those disputes arose after the restructuring plan was implemented. Nor has petitioner offered any sufficient business reason for HEI's maintaining millions of dollars in liquid reserves for over 3 years. See, e.g., New Mexico Bancorp. & Subs. v. Commissioner, 74 T.C. 1342 (1980). Whatever HEI's ultimate objectives for the borrowed funds may have been, its use of those funds for investments in the relevant years provides the "necessary purposive connection" for us to link the borrowing and

the investment.  See <u>Indian Trail Trading Post, Inc. v. Commissioner</u>, <u>supra</u> at 501.

V.  <u>Conclusion</u>

We are convinced that Waldorf II incurred a substantial portion of the 1987 indebtedness to fund the Investment Divisions and that the Investment Divisions used the borrowed funds to purchase and carry tax-exempt obligations and portfolio stock during the 3 years in issue.  Therefore, we have no doubt that a portion of the 1987 indebtedness was incurred to purchase and carry tax-exempt obligations (held in the Investment Divisions) for the purpose of section 265(a)(2) and that a portion of the indebtedness is directly attributable to the purchase and carrying of portfolio stock (by the Investment Divisions) for the purpose of section 246A.  We note, however, that in a less clear-cut case we would be substantially aided in reaching a decision by the regulations called for by section 7701(f).

<u>Decision will be entered under Rule 155</u>.